**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| CINDY GINTER, ANNEMARIE ROGERS, AND LISA KAUFMAN on behalf of themselves and those similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>RBS CITIZENS, N.A., D/B/A CCO MORTGAGE, CHARTER ONE, AND CITIZENS BANK,<br><br>        Defendant. | Case No. 1:12-cv-00008-S-DLM |

**DEFENDANT'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CONDITIONAL CERTIFICATION**

## I.      INTRODUCTION

Plaintiffs' Motion for Conditional Certification ("Plaintiffs' Motion") seeks authorization to issue notice of this Fair Labor Standards Act ("FLSA") action to hundreds of current and former RBS Citizens, N.A. ("RBS Citizens") mortgage loan officers ("MLOs") nationwide. Plaintiffs' counsel assert in their brief that collective adjudication of all MLOs' claims is appropriate because "more than fifty (50) current and former MLOs [have] filed consent forms [and joined this action]," and "regardless of their location, Defendant's MLOs shared similar job duties and responsibilities, were paid in the same manner, worked more than forty hours per workweek, were classified as exempt employees and thus denied overtime pay, and were recently reclassified from exempt to non-exempt."  ECF No. 47 ("Pl. Brief") at 2, 9.  Indeed, Plaintiffs represent to the Court at least 12 times throughout their motion and accompanying brief that they are the same or similar to all RBS Citizens MLOs, relying on 20 boilerplate and conclusory declarations.

However, when the Court scratches the surface of these statements, it becomes clear that RBS Citizens MLOs in fact differ drastically in ways that are material to whether each MLO falls within one of the FLSA's overtime exemptions, and thus each MLO will need to be examined individually to determine whether he or she was, in fact, misclassified as an overtime-exempt employee.  Although Plaintiffs conveniently fail to mention this critical fact in their motion or brief, Plaintiffs' counsel Paul Lukas admits in an attached declaration that "[o]f the fifty-four (54) Plaintiffs, approximately eleven (11) work or worked for RBS as loan officers in a call center office in Cincinnati, Ohio.  These opt-in Plaintiffs differ from other named and opt-in Plaintiffs because they worked at a call center location, were paid a salary plus commissions, were reclassified in approximately March 2011, and reported to a different management group."  ECF No. 47-1 ("Lukas Decl.") at ¶ 4.  Thus, Plaintiffs' counsel admits that contrary to the multiple

1

assertions in the motion and brief that all MLOs are the same, a large subsection of RBS Citizens MLOs differ in their job duties, work location, compensation, and management.

In addition, the differences among RBS Citizens MLOs are not limited to these "call center" loan officers Plaintiffs' counsel has identified. Rather, RBS Citizens MLOs differ from one another in myriad ways, including their compensation, job locations, management, job duties, work hours, and, importantly, where they perform their work for RBS Citizens. Some of the most material differences relevant to their exempt status include:

### MLOs' Compensation

- MLOs' overall compensation varied significantly – while some MLOs earned less than $100,000 per year, many MLOs earned more than $100,000 per year and thus may qualify for the highly compensated exemption.[1]

- Some MLOs were paid a bi-weekly draw that did not exceed $455 per week, while the so-called "call center" MLOs identified by Plaintiffs' counsel and other MLOs who specialized in Community Reinvestment Act ("CRA") loans were paid a guaranteed salary that exceeded $455 per week, and thus likely satisfy the salary basis test for the administrative, highly compensated, and combination exemptions.[2]

- Some MLOs received a guaranteed salary during the first one to six months of their employment that exceeded $455 per week, and thus likely satisfy the salary basis test for the administrative, highly compensated, and combination exemptions for this part of their

---

[1] Ex. B, Ocko Decl. at ¶ 8.

[2] *Compare* Ex. C, Clousson Decl. at ¶ 4 *with* Wlodarski Decl. at ¶ 11 (Lukas Decl., Ex. W); *see also* Ex. B, Ocko Decl. at ¶ 12.

employment.[3]

### Where MLOs Perform Work

- Many MLOs set their own schedules, create their own business plans, and decide when and where to generate business.[4]

- Some MLOs claim that they never, "almost never," or "rarely" meet with customers outside of RBS locations.[5]

- Other MLOs *choose* to *routinely* meet with as many as upwards of 65% of their customers at their businesses, homes or other non-RBS Citizens locations, and thus likely qualify for the outside sales exemption.[6]

- Many MLOs regularly spend significant amounts of time out in the field away from their homes, offices, and branches on various other activities that generate new business for RBS Citizens, which also makes them likely to qualify for the outside sales exemption. For example, even named plaintiff Annemarie Rogers admits that she "[d]eveloped

---

[3] *See, e.g.,* Ex. H, Johnson Decl. at ¶ 8 (received salary of $8,500 per month for first two months with RBS Citizens) *with* Ex. S, Vasic Decl. at ¶ 3 (received salary of $4,000 per month for first three months with RBS Citizens and understands "that the initial amount varies from loan officer to loan officer based on their previous year sales and pre-existing pipeline").

[4] *See* Ex. G, Hennessy Decl. at ¶ 5 ("I work very independently. I develop my own marketing plans to grow my book of business. I also set my own schedule and I decide when and where to work to most effectively generate new business.").

[5] Ginter Decl. at ¶ 7 ("never" meets with customers outside of RBS locations) (Lukas Decl., Ex. L); Swoope Decl. at ¶ 7 ("almost never" meets with customers outside of RBS locations) (*Id.* at Ex. V); Kaufman Decl. at ¶ 7 (met with customers outside of RBS locations on "rare occasions") (*Id.* at Ex. M).

[6] *See, e.g.,* Ex. S, Vasic Decl. at ¶ 5 ("In order to deliver a high level of personalized service, I meet with 95% of my customers in-person at the location that is most convenient for them. I meet with 60% of my customers in their homes, 5% of my customers at their businesses and/or places of employment, and the remainder at [a branch, my office], or, occasionally I meet with customers at a coffee shop or other public place.").

business by <u>persistent and relentless sales calling</u> on potential referral sources, such as realtors, developers, financial planners, attorneys and nonprofit housing organizations."[7]

**MLOs' Job Duties**

- Some MLOs allege that their job is mechanical and that they simply "collect[] the same standard information and documentation [and] submit[] the loan package for approval by underwriting."[8]

- Other MLOs spend significant amounts of time using their judgment and discretion to analyze their clients' complex financial information and advise them about how to best structure their loans or improve their credit, making them likely to qualify for the administrative, highly compensated, and/or combination exemptions for all or part of their employment with Citizens.[9]

These marked differences among MLOs and the other differences outlined *infra* show that contrary to Plaintiffs' assertions in their motion and brief, all RBS Citizens MLOs are not, in fact, similar, but rather are different in many key ways that will determine whether they were properly classified by RBS Citizens as exempt under the FLSA. Even at this early stage of the litigation, it is evident that some MLOs may fall into different exemptions or a combination of exemptions, others may fall into the same exemption for different reasons, and in certain instances, the

---

[7] Rogers LinkedIn Profile (emphasis added) (Ex. A, Holbrook Decl., at Ex. 1); *see also, e.g.*, Ex. H, Johnson Decl. at ¶ 4 ("I spend about 50% of my time generating business out in the community by meeting with clients and referral sources at Starbucks or at their offices, attending lunches and other social events with referral sources, attending closings, and doing presentations for realtors and other referral sources.").

[8] *See, e.g.,* O'Keefe Decl. at ¶ 4 (Lukas Decl., Ex. O).

[9] *See, e.g.,* Ex. D, Delbonis Decl. at ¶ 6 ("I work with a lot of self-employed clients, and I spend a great deal of time analyzing their financial information and helping them to document their income. Another important aspect of my job is advising my clients about the loan options that make the most sense for them . . . I also sometimes advise my customers who are currently ineligible for a mortgage loan about strategies for becoming eligible . . . I will sit down with the customer, review their credit with them, and help them to develop strategies for improving their credit score so that they can obtain a mortgage loan.").

applicable exemption varies over time with respect to the same MLO.  Quite simply, unlike cases where the lawfulness of a particular policy applicable to all class members makes collective adjudication logical and appropriate, the exempt status of each loan officer will need to be decided on an individual basis for each MLO, not in some collective way applicable to all MLOs. Accordingly, collective treatment of all MLOs claims would be fruitless and judicially inefficient, and RBS Citizens respectfully requests that the Court, like other Courts facing similar facts, deny Plaintiffs' Motion for Conditional Certification.  *See, e.g., O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) (denying Conditional Certification where plaintiffs failed to identify a decision, policy or plan that violated the law and holding that "[u]nder the FLSA, the question of whether an employee is properly exempted involves a fact-intensive inquiry into his/her job responsibilities and autonomy, the management style of the employee's supervisor and whether that employee worked over 40 hours per week.  One cannot merely assume, as the plaintiffs have here, that [defendant's] employees throughout the country and corporate structure were subject to the same 'policy' of an allegedly improper exemption."); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 550-51 (E.D. Mich. 2004) (denying plaintiffs' conditional certification motion upon court's finding that outside sales exemption likely applied to MLOs); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (refusing to certify a class of MLOs in a misclassification case because individual determinations as to how and where loan officers performed their duties would be required to determine whether each loan officer qualified for the outside sales exemption).

## II.    LEGAL BACKGROUND

To evaluate whether the Court should authorize notice, the Court must consider how Plaintiffs' claims will be proven.  In 1938, Congress enacted the FLSA to "aid the unprotected, unorganized and lowest paid of the nation's working population . . . ." *Brooklyn Sav. Bank v.*

*O'Neil*, 324 U.S. 697, 707 n.18 (1945). The FLSA requires that employees be paid a premium rate for hours worked above 40 in a workweek—unless they qualify for one or more exemptions. 29 U.S.C. §§ 207, 213. Any one or a combination of these exemptions would need to be considered for each MLO to resolve Plaintiffs' claims. *See Trinh v. JP Morgan Chase & Co.*, No. 07-1666, 2008 WL 1860161, at *4 n.4 (S.D. Cal. Apr. 22, 2008).[10]

### A. Outside Sales Exemption

To meet the outside sales exemption, an employee's primary duty must be: "making sales within the meaning of . . . the Act," and the employee must be "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500. "Making sales" does not necessarily occur at one time and/or location, but may involve several component activities. Work in the office incidental to the MLO's outside sales efforts, such as following up on contacts and leads generated during outside sales visits, falls within the outside sales exemption. *See Olivo*, 374 F. Supp. 2d at 550-51 (denying plaintiffs' conditional certification motion upon Court's finding that outside sales exemption likely applied to MLOs). Indeed, the U.S. Department of Labor ("DOL") and courts agree that employees who

---

[10] Recognizing the fact-intensive inquiries into each MLO's job duties, job locations, compensation, and management that will be necessary if this case proceeds collectively is not—as Plaintiffs argue—an impermissible inquiry into the merits that should be deferred. Defendant does not ask the Court to determine, at this stage, whether any MLOs qualify for any of the various exemptions. Rather, Defendant merely asks the Court to recognize that it is impossible to determine on a collective basis whether all MLOs were misclassified, and highly individualized inquiries will be necessary to determine whether each individual MLO was, in fact, misclassified. To turn a blind eye to these individualized issues until another day ignores that this Court must decide, at this stage, how this case would be adjudicated, and if it would be judicially efficient to do so on a collective basis. *Melendez Cintron v. Hershey Puerto Rico, Inc.*, 363 F. Supp. 2d 10, 14 (D.P.R. 2005) ("as a matter of sound case management, a court should, before offering to assist plaintiffs in locating additional plaintiffs, make a preliminary inquiry as to whether a manageable class exists"); *Trinh*, 2008 WL 1860161, at *5 ( "[T]he Court is not opining whether Plaintiffs, or any other [MLOs,] have meritorious claims to overtime compensation; rather, the Court is examining the legal backdrop and type of evidence required to prove whether any employee is exempt or not."); see also *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004) ("'[S]imilarly situated' inquiry . . . must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt."); *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 477 (S.D.N.Y. 2008) (denying notice after evaluating applicability of administrative exemption because "notice would not promote the fair and expeditious resolution of the claims raised in this action").

regularly spend as little as 10% of their time actually outside generating business may qualify for the outside sales exemption. *See* FLSA 2007-2, DOL Opinion Letter, at 3-4 (Jan. 25, 2007) (confirming that regular selling or sales related activity outside the office "one or two hours a day, one or two times a week" satisfied the outside sales exemption test); *Taylor v. Waddell & Reed, Inc.*, No. 09-2909, 2012 WL 10669, at *3-4 (S.D. Cal. Jan. 3, 2012) (finding two financial advisors qualified for outside salesperson exemption and recognizing that spending only 10-20% of the time, or just one or two hours a day once or twice weekly, outside the office is sufficient for this exemption); *Lint v. Northwestern Mut. Life Ins. Co.*, No. 09-1373, 2010 WL 4809604, at *3 (S.D. Cal. Nov. 19, 2010) (holding that plaintiff was an exempt outside salesman where "approximately 10-20 percent of his time was spent meeting with clients or prospective clients outside of the office and that the remaining 80 percent of his time was spent making calls in order to generate additional sales or training other sales agents[,] . . . [h]e was responsible for building his own client base and used various methods to do so, including searching the Yellow Pages and the internet, cold calling prospective clients, attending meetings of targeted organizations, making appointments with and dropping in on small business owners, and purchasing advertising[,] . . . [and he] determined his own schedule, often working during the weekday, in the evenings, and on weekends") (internal citations omitted).

Moreover, the DOL has specifically opined that a loan officer may qualify as an exempt outside salesperson. *See* FLSA 2006-11 ("[E]mployees of finance companies who obtain and solicit mortgages may be exempt outside sales employees if they are 'customarily and regularly' engaged away from the employer's place of business in obtaining mortgages from brokers and individuals."). As such, each loan officer "*must be evaluated on an individual basis* to determine whether he or she qualifies for the outside sales exemption." *Id.* (emphasis added).

7

## B.     Retail Services Exemption

Under FLSA Section 7(i), an individual is an exempt employee if he or she:  (1) works in a retail or service establishment; (2) receives a regular rate of pay of at least one and one-half times the minimum wage; and (3) receives more than half of his or her compensation for a representative period (not less than one month) in the form of commissions on goods and services.  29 U.S.C. § 207(i).[11]   The second and third elements of the exemption focus on an employee's earnings, and these elements require individualized analyses as they may vary by week for each MLO.  *See Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005) (rejecting collective action because the "proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which . . . would amount to trials of perhaps as many as 200 individual cases").

## C.     Administrative Exemption

The administrative exemption requires a primary duty that:  (1) consists of the performance of non-manual work; (2) is directly related to management policies or general business operations of the employer or the employer's customers; and (3) includes the exercise of discretion and independent judgment with respect to matters of significance.   29 C.F.R. § 541.200.  To determine whether an employee performs work directly related to management or general business operations, the DOL directs that "each case must be examined individually."  69 Fed. Reg. 22,122, 22,142 (Apr. 23, 2004) (codified at 29 C.F.R. § 541.201).   Specifically

---

[11] Plaintiffs may argue that Defendant is not a "retail or service establishment" because a 40-year old interpretative guideline includes businesses in the finance industry on a list of establishments for which it is not readily apparent that a retail concept exists.  *See* 29 C.F.R. § 779.317.  Federal appellate and district courts, however, have refused to defer to § 779.317, characterizing the DOL's list as irrational and arbitrary.  *See e.g.*, *Martin v. Refrigeration Sch., Inc.*, 968 F.2d 3, 7 (9th Cir. 1992); *Alvarado v. Corp. Cleaning Serv., Inc.,* 719 F. Supp. 2d 935, 946 (N.D. Ill. 2010); *Reich v. Cruises Only, Inc.*, No. 95-660, 1997 WL 1507504, at *5 (M.D. Fla. June 5, 1997).  The location of many RBS Citizens branch locations in strip malls and retail shopping areas shows that RBS Citizens is, in fact, a retail or service establishment.  *See, e.g.*, Ex. S, Vasic Decl. at ¶ 2 (covers one bank branch in a strip mall); Ex. N, Renner Decl. at ¶ 2 ("All of my [five] branches are located close to retail shopping areas.")

addressing the exemption status of employees in financial services, the DOL's regulations explain:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. § 541.203(b).

Along these lines, in September 2006, the DOL issued an opinion letter concluding that a loan officer who performs certain duties is exempt under the administrative exemption even if he or she is "involved in some selling to consumers." DOL Op. Letter, FLSA 2006-31, Sept. 8, 2006 ("FLSA 2006-31"). The DOL advised that "an employee's exempt status is not determined based on job title or job classification; rather, it is determined by *analyzing each particular employee's actual job duties and compensation* under the applicable regulations." *Id.* at 1 (emphasis added). Further, assessing clients' financial circumstances and goals, comparing and evaluating options, and advising clients evidence the use of discretion and independent judgment. DOL Op. Letter, FLSA 2006-43, Nov. 29, 2006 ("FLSA 2006-43").[12]

### D. Highly Compensated Employee Exemption

The FLSA also exempts from overtime pay requirements any employee with "total annual compensation of at least $100,000.00," provided the employee customarily and regularly

---

[12] Although in its March 24, 2010 Administrator's Interpretation No. 2010-1 ("AI 2010-1"), the DOL opined that certain loan consultants who performed their duties at their employer's place of business did not qualify for the administrative exemption, the DOL has taken the unequivocal position that AI 2010-1 has no retroactive effect. *See* Secretary of Labor Amicus Brief in *Henry v. Quicken Loans*, No. 2:04-cv-40346-SJM-MJH, at 26-28 (E.D. Mich. Dec. 9, 2010), the relevant pages of which are attached as Exhibit 8 to Holbrook Decl. (Ex. A); *see also Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999). In any event, the DOL's sudden shift in position cannot trump the FLSA's regulations. *See Hein v. PNC Fin. Servs. Group., Inc.*, 511 F. Supp. 2d 563, 571 (E.D. Pa. 2007) (applying 29 C.F.R. § 541.203(b) rather than the DOL's opinion letter to find financial consultant administratively exempt).

9

performs any one or more exempt executive, administrative, or professional duties.   29 C.F.R. § 541.601(a).   The reason for this exemption is obvious:   "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."   29 C.F.R. § 541.601(c).

      **E.**      **Combination Exemption**

      The FLSA also exempts employees "who perform a combination of exempt duties."   29 C.F.R. § 541.708.   Thus, a loan officer may be exempt if he or she performs a combination of exempt duties under different exemptions, even where neither set of duties considered separately would constitute the individual's "primary duty."   *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631-33 (7th Cir. 2010).   So, for example, the combination exemption applies when an employee meets with clients outside the office to make sales and then works in the office on marketing or customer service and sets his or her own schedule.   *Id.* at 633.

**III.**      **FACTUAL BACKGROUND**

      Named Plaintiffs Cindy Ginter, Anne Marie Rogers, and Lisa Kaufman are former MLOs who worked for RBS Citizens in Altoona, Pennsylvania and Detroit, Michigan.   ECF No. 1, ("Compl."), at ¶¶ 11-13.   Plaintiffs filed their Complaint alleging that they and other MLOs were unlawfully denied overtime compensation on January 9, 2012, but Plaintiffs' counsel have been advertising this lawsuit for much longer.   Instead of requesting a court-supervised and neutral notice process as proscribed by the Fair Labor Standards Act, Plaintiffs and their counsel have chosen to first engage in a massive extrajudicial notice process of their own.   For example, Plaintiffs' counsel created a website dedicated to this lawsuit with a pre-populated opt-in form and has issued press releases advertising this lawsuit on various websites, including PRWeb.com. *See* Nichols Kaster Website (http://www.nka.com/case/citizens-bank/ (last visited July 3, 2012)) (Ex. A, Holbrook Decl., at Ex. 2); Opt-in form (*Id.* at Ex. 3), PRWeb.com Press Release (*Id.* at

Ex. 4).  Moreover, Plaintiffs' counsel mailed solicitation letters to RBS Citizens MLOs before and after this lawsuit was filed, attempting to convince them to join the action.  *See* Ex. F, Graziani Decl. at ¶ 9 ("I received a letter in the mail a few months ago inviting me to join this lawsuit, but I decided not to join.  I feel that I am well-compensated as a commissioned loan officer, and I earned more than $100,000 per year every year since 2009."); Ex. G, Hennessy Decl. at ¶ 7 ("I received a letter in the mail from Nichols Kaster inviting me to join this lawsuit in December of 2011.  At that time I chose not to respond to the letter because I did not want to be bothered by the attorneys."); Ex. H, Johnson Decl. at ¶ 11 ("I received a letter from a lawyer about this lawsuit in the mail a few months ago.  I threw it away because I like my job and I feel that Citizens compensates me fairly for my work.  I earned over $200,000 in 2011 and am on track to exceed that amount in 2012."); Ex. N, Renner Decl. at ¶ 6 ("I received a letter in the mail about this lawsuit a few months ago from a law firm.  The letter informed me that I could sign up for the lawsuit.  I called and spoke with a paralegal, but I decided not to join because I would not want to sue my employer and I did not think the lawsuit was warranted based on the information that was given to me."); Ex. Q, Sonsini Decl. at ¶ 6 ("I have received <u>two</u> letters about this lawsuit in the mail, but I decided not to join because I feel that it is more lucrative to be paid on a commissioned basis rather than an hourly basis and I am happy with my employment and compensation with Citizens.") (emphasis added); Ex. T, Von Flatern Decl. at ¶ 11 ("I received a letter in the mail about this lawsuit a few months ago from an attorney.  I did not respond to the letter and gave it to my manager.  I did not contact the attorney because I have always liked my job and feel well-compensated for my work.").

Apparently dissatisfied with the 50 opt-ins their pervasive solicitation efforts have produced, Plaintiffs ask the Court to allow them to send yet another round of notice to "[a]ll

persons who worked as loan officers (or with a similar job title)" for RBS Citizens since 2009, whom they refer to collectively throughout their motion and brief as MLOs.  Compl. at ¶ 41.  As explained above, Plaintiffs rely on 20 boilerplate and conclusory declarations and represent to the Court in their brief that all MLOs are the same or similar.  However, MLOs, in fact, differ drastically.  Over the last 3 years, RBS Citizens has employed over 600 MLOs in a variety of positions and contexts – some are generally expected to generate their own leads and business; others are generally expected to work in an office fielding phone, internet, and branch leads; others focus on originating CRA loans; and others have focused on generating business from builders as part of a joint venture with a real estate company.  Ex. B, Ocko Decl. at ¶ 4.  RBS Citizens does not have centralized policies dictating how all MLOs are to perform their job duties, where and when to do so, or the number of hours that MLOs work.  *See, e.g.*, Ex. E, Dier Decl. at ¶ 3 ("At Citizens, I work very independently and it is up to me to decide where I work and how I go about generating business for Citizens."); Ex. G, Hennessy Decl. at ¶ 5 ("I work very independently.  I develop my own marketing plans to grow my book of business.  I also set my own schedule and I decide when and where to work to most effectively generate new business.").  As many MLOs explain, the position is highly entrepreneurial and like running an independent business.  *See, e.g.*, Ex. H, Johnson Decl. at ¶ 5 ("I think of my job as very entrepreneurial, as though I am running my own business."); Ex. L, Phillips Decl. at ¶ 4 ("I work very independently, almost as if I own my own business.").

Specifically, MLOs' compensation, locations, management, job duties, work hours, and where they perform their work differ in the following important ways:

**MLOs' Compensation**

•  MLOs' overall compensation varied significantly - 66 MLOs earned more than $100,000

in 2011, for example, and opt-in Barbara Mickelsen earned $537,513.50 in 2009.[13]

- Some MLOs received a guaranteed salary during the first one to six months of their employment that exceeded $455 per week, and this initial guaranteed salary was negotiated on an individual basis based on each MLO's past revenue and/or pipeline.[14]

- The so-called "call center" MLOs identified by Plaintiffs' counsel were paid a guaranteed salary that exceeded $455 per week until they became eligible for overtime in 2011, while other MLOs were paid a bi-weekly draw.[15]

- Some MLOs specialized in Community Reinvestment Act ("CRA") loans and received a guaranteed draw that exceeded $455 per week and were subject to a compensation plan that differed from other MLOs.[16]

- Some MLOs, including opt-in Chris Caldwell, worked within a joint venture RBS Citizens entered into with a real estate company and had compensation terms that differed from other MLOs.[17]

### MLOs' Job Locations and Management

- RBS Citizens operates 1,500 branch locations under the Citizens Bank and Charter One Bank brands and maintains offices in more than 30 states.[18]

---

[13] Ex. B, Ocko Decl. at ¶ 8.

[14] *Compare* Ex. H, Johnson Decl. at ¶ 8 (received salary of $8,500 per month for first two months with RBS Citizens) *with* Ex. S, Vasic Decl. at ¶ 3 (received salary of $4,000 per month for first three months with RBS Citizens and understands "that the initial amount varies from loan officer to loan officer based on their previous year sales and pre-existing pipeline") *and* Ex. M, Quon Decl. at ¶ 5 (received salary of $9,000 per month for first four months with RBS Citizens); *see also* Ex. B, Ocko Decl. at ¶ 9 (some MLOs receive initial salary for their first one to six months with RBS Citizens based on previous year sales and pre-existing pipeline; others did not).

[15] *Compare* Ex. C, Clousson Decl. at ¶ 4 *with* Wlodarski Decl. at ¶ 11 (Lukas Decl., Ex. W).

[16] Ex. B, Ocko Decl. at ¶ 12.

[17] *Id.* at ¶ 11.

[18] Lukas Decl., Ex. C.

- Each of the hundreds of MLOs in the proposed collective action reported to one of <u>dozens</u> of different managers in two separate channels of RBS Citizens.[19]

- Some MLOs, including opt-in Chris Caldwell, were managed by both a RBS Citizens manager as well as a real estate company manager pursuant to a joint venture agreement.[20]

- Many MLOs choose for themselves where they will perform their work for RBS Citizens.[21]

- The so-called "call center" MLOs work exclusively or primarily in offices in East Providence, Rhode Island and Cincinnati, Ohio.[22]

- Some MLOs perform work in their home offices.[23]

- Some MLOs have desks or offices within a private RBS Citizens office that is not open to the public and does not have walk-in traffic.[24]

- Some MLOs cover anywhere from 1 to 10 branches, many of which are located in retail stores, strip malls, and retail shopping areas.[25]

- Some MLOs choose to cover no branches.[26]

---

[19] Ex. B, Ocko Decl. at ¶ 3.

[20] *Id.* at ¶ 11.

[21] *See, e.g.*, Ex. E, Dier Decl. at ¶ 3 ("At Citizens, I work very independently and it is up to me to decide where I work and how I go about generating business for Citizens."); Ex. R, Stulpin Decl. at ¶ 2 ("I have my own desk at the Plymouth Meeting, Pennsylvania office, but I only spend about 2 hours per month working there. I work very independently and choose to spend the vast majority of my work time generating business, out in the community, at four branches I cover, and at home.").

[22] *See, e.g.*, Ex. C, Clousson Decl. at ¶ 2; Ex. K, Monroe Decl. at ¶ 2; Ex. T, Von Flatern Decl. at ¶ 3.

[23] *See, e.g.,* Stepp Decl. at ¶ 3 (Lukas Decl., Ex. T); Wlodarski Decl. at ¶ 3 (*Id.* at Ex. W).

[24] *See, e.g.*, Ex. G, Hennessy Decl. at ¶ 2.

[25] *See, e.g.*, Ex. S, Vasic Decl. at ¶ 2 (covers one bank branch in a strip mall); Ex. N, Renner Decl. at ¶ 3 ("All of my [five] branches are located close to retail shopping areas."); Cowan Decl. at ¶ 3 (covers 8-10 branches) (Lukas Decl., Ex. J).

[26] *See, e.g.*, Ex. E, Dier Decl. at ¶ 4 ("I choose not to cover any RBS Citizens branches because I feel I can be more successful by fostering relationships with real estate attorneys and other referral sources . . . .").

- Some MLOs, including opt-in Chris Caldwell, worked from real estate offices pursuant to joint venture arrangements with real estate companies.[27]

**Where MLOs Perform Work**

- Some MLOs set their own schedules, create their own business plans, and decide when and where to generate business.[28]

- Some MLOs claim that they never meet with customers outside of RBS locations.[29]

- Some MLOs claim that they "almost never," "very rarely," or "rarely" meet with customers outside of RBS locations.[30]

- Other MLOs *choose* to *routinely* meet with customers outside of RBS locations.[31]

- Many MLOs also regularly spend significant amounts of time out in the field away from their homes, offices, and branches on various other activities that generate new business for RBS Citizens. For example, named plaintiff Annemarie Rogers states in her LinkedIn profile that as a Charter One Bank Loan Officer, she "[d]eveloped business by persistent

---

[27] Ex. B, Ocko Decl. at ¶ 11.

[28] *See* Ex. G, Hennessy Decl. at ¶ 5 ("I work very independently. I develop my own marketing plans to grow my book of business. I also set my own schedule and I decide when and where to work to most effectively generate new business.").

[29] Ginter Decl. at ¶ 7 (Lukas Decl., Ex. L); Ryan Decl. at ¶ 7 (*Id.* at Ex. R); Smith Decl. at ¶ 7 (*Id.* at Ex. S) (all containing same boilerplate allegation).

[30] *See, e.g.*, Swoope Decl. at ¶ 7 ("almost never" meets with customers outside of RBS locations) (Lukas Decl., Ex. V); Cowan Decl. at ¶ 7 ("very rarely" meets with customers outside of RBS locations) (*Id.* at Ex. J); Kaufman Decl. at ¶ 7 (met with customers outside of RBS locations on "rare occasions") (*Id.* at Ex. M).

[31] *See. e.g.*, Ex. S, Vasic Decl. at ¶ 5 ("In order to deliver a high level of personalized service, I meet with 95% of my customers in-person at the location that is most convenient for them. I meet with 60% of my customers in their homes, 5% of my customers at their businesses and/or places of employment, and the remainder at [a branch, my office], or, occasionally I meet with customers at a coffee shop or other public place."); Ex. R, Stulpin Decl. at ¶ 4 ("I meet with approximately 50% of my customers in person, and I let them choose the meeting place that is most convenient for them." Sometimes they choose to meet at "their offices or at public places like Starbucks."); Ex. D, Delbonis Decl. at ¶ 4 ("I think it is very important to meet with my customers in-person to provide a high level of customer service. I meet with almost 100% of my local clients in-person, and I meet with about 25% of these clients outside of my branches at their workplaces when the client states a preference to meet there. I have also met with customers at their homes when it is necessary to accommodate their needs.").

<u>and relentless sales calling</u> on potential referral sources, such as realtors, developers, financial planners, attorneys and nonprofit housing organizations."   Rogers LinkedIn Profile (emphasis added) (Ex. A, Holbrook Decl., at Ex. 1).[32]

- Some MLOs have developed specialty niches that require them to spend more time outside of the office meeting with referral sources and/or clients.[33]

### **MLOs' Job Duties**

- The job duties of some MLOs are largely left to their discretion.[34]

- Some MLOs allege that their job is mechanical and that they simply "collect[] the same standard information and documentation [and] submit[] the loan package for approval by underwriting."[35]

- Some MLOs frequently work with RBS Citizens' portfolio products and are responsible for working directly with the Exceptions Department to show that the client should be approved for a portfolio product despite not meeting the guidelines.[36]

- Some MLOs work primarily with high income clients and spend a great deal of time analyzing their financial information and assisting their client with documenting their

---

[32] *See also, e.g.*, Ex. H, Johnson Decl. at ¶ 4 ("I spend about 50% of my time generating business out in the community by meeting with clients and referral sources at Starbucks or at their offices, attending lunches and other social events with referral sources, attending closings, and doing presentations for realtors and other referral sources.").

[33] *See, e.g.*, Ex. R, Stulpin Decl. at ¶ 6 ("I have developed a specialty in loans for properties along the New Jersey shore. . . . [T]he market for these loans is very competitive.  I have to pay special attention to these realtors with frequent visits, otherwise they will refer the business to other loan officers.").

[34] *See, e.g.*, Ex. M, Quon Decl. at ¶ 3 ("I like working for Citizens because it allows me to be autonomous.  I am able to interpret how the job should be done and create my own job duties in addition to the basic duties required by Citizens.").

[35] *See, e.g.,* O'Keefe Decl. at ¶ 4 (Lukas Decl., Ex. O).

[36] *See* Ex. H, Johnson Decl. at ¶ 9.

income.[37]

- Some MLOs work with CRA loans and/or first time homebuyers and spend a great deal of time advising and educating their clients.[38]

- Some MLOs frequently encounter ineligible clients and perform a comprehensive review of their credit to advise them how they can become eligible for a mortgage.[39]

- Some MLOs work in diverse areas that require them to handle a wide variety of loans.[40]

  **MLOs' Work Hours**

- Some MLOs claim that they "frequently" or "routinely" worked more than 40 hours per week.[41]

- Other MLOs testify that it was up to them how many hours they worked and they only "sometimes" or "occasionally" chose to work more than 40 hours.[42]

- Some MLOs "very rarely" worked more than 40 hours and often worked <u>less</u> than 40

---

[37] *See, e.g.*, Ex. E, Dier Decl. at ¶ 5 ("I work with mostly high income clients . . . and I spend more time analyzing their often complex financial information than I do educating them about their options."); Ex. D, Delbonis Decl. at ¶ 6 ("I work with a lot of self-employed clients, and I spend a great deal of time analyzing their financial information and helping them to document their income.

[38] Ex. N, Renner Decl. at ¶ 5 ("I work with mostly medium-income clients and I have originated some CRA and FHA loans.  A big part of the sales process for mortgages is analyzing clients' financial information and advising them about the loan options that might work best for them."); Ex. I, Klender Decl. at ¶ 7 ("Originating loans for first time homebuyers can require up to 2-3 in-person meetings because they often have a lot of questions and need a lot of information before they make the decision to go with a Citizens mortgage loan.").

[39] Ex. D, Delbonis Decl. at ¶ 6 ("It is common these days in the current economy for my customers to have "dents" in their credit that preclude them from qualifying for a mortgage loan.  In these situations, I will sit down with the customer, review their credit with them, and help them to develop strategies for improving their credit score so that they can obtain a mortgage loan."); Ex. J, Marcus Decl. at ¶ 7 ("I routinely advise my customers with low credit scores about how they can improve their credit . . . .").

[40] *See, e.g.*, Ex. F, Graziani Decl. at ¶ 7 ("Buffalo is a diverse area, and I have to specialize in every type of loan to be successful.").

[41] *See, e.g.*, Connors Decl. at ¶ 10 (Lukas Decl., Ex. I); Kaufman Decl. at ¶ 11 (*Id.* at Ex. M).

[42] *See, e.g.*, Ex. C, Clousson Decl. at ¶ 4 ("Some weeks I worked less than 40 hours, but sometimes I chose to work a few hours over 40 because I felt it helped me to close more loans and make more money."); Ex. T, Von Flatern Decl. at ¶ 8 ("I typically worked around 40 hours per week.  I enjoy spending time with my family, and I tried to keep my hours around 40. . . . However, occasionally, when business was busy and my personal life was slow, I would work more than 40 hours.").

hours.[43]

Thus, there is significant variation among MLOs with regard to their specific job duties, where those duties are performed, how much discretion and independent judgment they exercise, their compensation plans, and the hours they work. Some of these differences arise not only among different MLOs, but also vary with respect to the same MLO over time. *See, e.g.,* Ex. I, Klender Decl. at ¶ 6; Ex. L, Phillips Decl. at ¶ 8.

## IV.   ARGUMENT

### A.   The Standard For Collective Action Certification

Defendant has already thoroughly briefed the standard it urges this Court to apply to Plaintiffs' Motion for Conditional Certification in its briefing in support of Defendant's Motion to Set the Legal Standard for Conditional Certification Under the Fair Labor Standards Act. ECF No. 20-1 ("Motion to Set the Legal Standard Brief"); ECF No. 37 ("Motion to Set the Legal Standard Reply Brief") (collectively "Motion to Set the Legal Standard Briefing"). Pursuant to the Court's June 6, 2012 Text Order, Defendant hereby incorporates those arguments by reference and will not restate all of the arguments in support of the standard it has proposed. However, Defendant urges the Court to apply a <u>meaningful</u> Conditional Certification standard that requires more than canned language in an initial complaint and boilerplate declarations. Rather, the Court should require Plaintiffs to show through admissible evidence that they were subject to a common *unlawful* policy and that their claims can be proven with common evidence.

The importance of Conditional Certification cannot be overstated, and it is often dispositive of a lawsuit. Once notice is issued to potential class members, expensive and often

---

[43] *See, e.g.,* Ex. K, Monroe Decl. at ¶ 4 ("I chose to work very efficiently during the day, and I very rarely worked more than 40 hours. The most I ever recall working was 42 hours in a week, and I very rarely worked on Saturdays. Many weeks, I would estimate that I worked less than 40 hours . . . Sometimes I would stay late to call customers, but I would choose to make up for this time by coming in late the next morning.").

cost-prohibitive class-wide discovery ensues and the employer's relationship with its current employees is "irreparabl[y] harmed." *See, e.g., Boyd v. Alutiiq Global Solutions, LLC*, No. 11-0753, 2011 WL 3511085, at *6-7 (N.D. Ill. Aug. 8, 2011) (recognizing that the discovery demands employers face upon Conditional Certification can impose "a tremendous financial burden to the employer"); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (recognizing that premature notice to a nationwide class "surely cause[s] serious and irreparable harm to [defendant]'s reputation and to its relationship with its employees"). Accordingly, employers are often forced to settle these actions because the discovery burdens are simply too great and too disruptive.

Yet Plaintiffs advocate for a "rubber stamp" approach by which the Court should grant Conditional Certification so long as Plaintiffs' "simply alleg[e] that the putative class members were together the victims of a single decision, policy, or plan that violated the law." Pl. Brief at 5-6 (internal quotations omitted). In apparent recognition of the weakness of their evidence, throughout their motion and brief, Plaintiffs' state no less than 8 times that their burden should be lenient, low, or minimal. Plaintiffs would have the Court grant Conditional Certification based solely on mere allegations of similarity, even where, as here, Defendant shows that their allegations are simply false through its own evidence and through Plaintiffs' attorneys' own admission of dissimilarity.

This case is a quintessential example of the utter inefficiency of the approach Plaintiffs advocate. Approving nationwide notice to hundreds of class members where it is already clear that the class members are not similarly situated would be the antithesis of judicial efficiency, which was Congress' stated purpose in adopting Section 216(b). *See, e.g., Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008) ("'[i]t would be a waste

19

of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'") (quoting *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d, 941, 945 (W.D. Ark. 2003).  As one court recently explained, the low Conditional Certification standard advocated by Plaintiffs "render[s] [Conditional Certification] automatic upon the magic words: others similarly situated[,]" is an "inefficient and overbroad application of the opt-in system, . . . places a substantial and expensive burden on a defendant[,] . . . is at odds with the Supreme Court's recommendation to ascertain the contours of the action at the outset, and . . . does not comport with the congressional intent behind the FLSA's opt-in requirement, which was designed to limit the potentially enormous size of FLSA representative actions . . . [and] reduce excessive litigation spawned by plaintiffs lacking a personal interest in the outcome."  *Wright v. Lehigh Valley Hosp.*, No. 10-0431, 2010 WL 3363992, at *3 (E.D. Pa. Aug. 24, 2010) (internal quotations omitted).

Instead, the Court should apply the meaningful standard Defendant has proposed because it weeds out cases such as this one that involve dissimilar claims that do not involve common unlawful policies and will not be proven through common evidence.  Plaintiffs here have failed to identify a common unlawful policy applicable to all MLOs, and Plaintiffs cannot prove that all MLOs were misclassified with any common proof.  Rather, individualized inquiries into each MLO's job duties, job locations, compensation, and management, which differ drastically among RBS Citizens' MLOs, will be necessary to determine whether one or more exemptions applies to that individual MLO.

Specifically, the elements of the applicable exemptions will require the Court to make the following determinations, among others, to adjudicate each MLO's FLSA claim:

20

- The job duties *actually performed* by each MLO on a daily basis. *See O'Donnell*, 429 F. Supp. 2d at 250.[44]

- The amount of time each MLO spent performing *each* of his or her day-to-day duties. 29 C.F.R. § 541.700(b).

- Whether each MLO received over $100,000 annually and, if so, whether he or she regularly performed a *single exempt duty*. 29 C.F.R. § 541.601(a).

- Whether and to what extent each MLO's job duties involved the exercise of discretion and independent judgment. 29 C.F.R. § 541.200(a)(2)-(3).

- Whether and to what extent each MLO's duties included collecting and analyzing clients' financial information; determining which products best meet the clients' needs and circumstances; advising clients regarding pros and cons of different financial products; and/or marketing, servicing or promoting RBS's products. 29 C.F.R. § 541.203(b).

- The amount of time each MLO worked outside of the bank branch and the extent to which each MLO engaged in sales duties and duties ancillary to exempt outside sales duties. 29 C.F.R. § 541.500; FLSA 2006-11, Mar. 31, 2006 ("FLSA 2006-11").

- Whether each MLO performed a sufficient mix of different types of exempt duties to qualify for the combination exemption. 29 C.F.R. § 541.708.

Because it is clear even at this early stage of the litigation that these fact-intensive, individualized inquiries would be necessary to resolve each MLO's claim, Defendant urges the Court to decline to exercise its discretion to issue notice.

---

[44] *See also Orr v. James D. Julia, Inc.*, No. 07-51, 2008 WL 2605569, at *12-14 (D. Me. June 27, 2008) (analyzing the duties plaintiff performed in concluding that plaintiff was exempt under the administrative exemption); *Miranda-Albino v. Ferrero, Inc.*, 455 F. Supp. 2d 66, 74-75 (D.P.R. 2006) ("stress[ing] the importance of considering the content of the job as a whole rather than relying on its title or designation when considering the applicability of the outside salesperson exemption" and considering "detailed testimony regarding [plaintiff's] day-to-day tasks" in deciding whether outside sales exemption applied); *Trinh*, 2008 WL 1860161, at *4 n.4.

### B.    MLOs Are Particularly Ill-Suited For Collective Action Treatment.

The heterogeneity of the proposed class here is precisely what has led courts to deny conditional certification of nationwide collective actions of MLOs.  *See, e.g., Olivo*, 374 F. Supp. 2d at 551 (denying collective action of MLOs due to presence of the outside sales exemption); *Oetinger v. First Residential Mortg. Network, Inc.*, No. 06-381, 2009 WL 2162963 at *2-4 (W.D. Ky. July 16, 2009) (decertifying a mortgage banker collective action in part because of "no company-wide plan strictly governing the particular duties of every mortgage banker"; "[t]he central question in the case, whether Plaintiffs are properly classified as exempt, cannot be determined on a class-wide basis")[45]; *Trinh*, 2008 WL 1860161, at *4 (denying conditional certification of nationwide collective action of loan officers because "the need for individual evidence makes a class or collective action an unwieldy method for determining the rights of many litigants"); *Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781, at *2 (D.N.J. May 19, 2006) (plaintiff failed to show that a class of similarly situated loan consultants existed); *Chemi v. Champion Mortg.*, No. 05-1238, slip op. (D.N.J. June 21, 2006) (denying conditional certification of class of loan consultants) (Ex. A, Holbrook Decl., at Ex. 5); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 509-11 (M.D. La. 2005) (denying nationwide conditional certification for lack of evidence that loan consultants were subjected to an illegal nationwide policy); Transcript of Oral Argument, *Becton v. JPMorgan Chase & Co.*, No. 1:11-cv-00331, (N.D. Ill. Apr. 11, 2011) (denying conditional certification of proposed nationwide class of MLOs grounded on alleged common job descriptions and common incentive pay plan) (Ex. A, Holbrook Decl., at Ex. 6).  Plaintiffs' "string-cite" to a series of other district court-level

---

[45]    In *Oetinger*, a second-stage decertification case, the defendant did not contest plaintiffs' motion for court-supervised notice.  (Ex. A, Holbrook Decl., at Ex. 7).

loan officer cases, without any explanation, is also of no help to them, as they have distinguishing characteristics, are poorly reasoned, and/or do not justify certification here.  Pl. Brief at 10-11.[46]  As a result, this Court must look at the facts and record presented in this matter to determine whether the MLOs are similarly situated to each other, and it is clear that they are not.

**C.    Plaintiffs Have Failed To Demonstrate That They Are Similarly Situated To The Members Of The Proposed Class.**

*1.    Plaintiffs Have Not Identified Any <u>Unlawful</u> Decision, Policy Or Plan.*

Plaintiffs' failure to establish that they all were subject to a "single decision, policy or plan *that violated the law*" is an independent ground for denial of their motion.  *O'Donnell*, 429 F. Supp. 2d at 250 (quotation omitted, emphasis added) (denying conditional certification because defendant "is a large company with a business presence throughout the country" and plaintiffs failed to "show a single decision, policy or plan that violated the law" and applied to all of them);

---

[46]  For example, in many cases cited by Plaintiffs, the defendants failed to submit any MLO declarations showing differences among MLOs in support of their opposition to Conditional Certification. *Jancich v. Stonegate Mortg. Corp.*, No. 11-2602, 2012 WL 380287 (D. Kan. Feb. 6, 2012) (defendant submitted no declarations in opposition to conditional certification and only opposed conditional certification to the extent that plaintiff sought to certify a nationwide collective action); *Robinson v. Empire Equity Group, Inc.*, No. 09-1603, 2009 WL 4018560 at *3 (D. Md. Nov. 18, 2009) (defendant submitted no MLO declarations in opposition to motion to certify); *Garcia v. Freedom Mortg. Corp.*, No. 09-2668, 2009 WL 3754070, at *4-5 (D.N.J. Nov. 2, 2009) (defendant submitted no MLO declarations and (in stark contrast to here) the court found that "[t]here is no evidence that discovery would require person-by-person fact intensive inquiries for more than a handful of people."); *McCaffrey v. Mortg. Sources, Corp.*, No. 08-2660, 2009 WL 2778085, at *3-4 (D. Kan. Aug. 27, 2009) (defendant submitted no MLO declarations); *Bifulco v. Mortg. Zone, Inc.*, 262 F.R.D. 209, 213 (E.D.N.Y. 2009) (defendant submitted no MLO declarations and made no legal argument that MLOs were properly classified as exempt employees); *Vondriska v. Premier Mortg. Funding, Inc.*, 564 F. Supp. 2d 1330, 1335-36 (M.D. Fla. 2007) (defendant submitted no MLO declarations); *Stanfield v. First NLC Fin. Servs., LLC*, No. 06-3892, 2006 WL 3190527, at *3-4 (N.D. Cal. Nov. 1, 2006) (defendant submitted no MLO declarations and failed to "demonstrate any significant differences in the[] job duties" of MLOs).

In other cases, the defendants failed to address the pertinent issue at the Conditional Certification stage – whether the MLOs were similarly situated. *Lewis v. Huntington Nat'l Bank*, 789 F. Supp. 2d 863 (S.D. Ohio 2011) (rather than opposing Conditional Certification, the defendant sought summary judgment and submitted a company affidavit admitting that <u>all</u> MLOs performed identical job duties); *Swigart v. Fifth Third Bank*, 276 F.R.D. 210 (S.D. Ohio 2011) (the court called into question the strategy employed by defendant because defendant did not address whether the proposed class members were similarly situated to the plaintiffs); *Vaughan v. Mortgage Source LLC*, No. 08-4737, 2010 WL 1528521 at *6-7 (E.D.N.Y. Apr. 14, 2010) (granting Conditional Certification where "[d]efendants' argument in opposition . . . is, in effect, that [MLOs] . . . simply did not and do not work more than 40 hours per week[,]" an argument not appropriate on conditional certification).

*see also Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242, 247 (D.R.I. 1999) (recognizing that other courts have required a single decision, policy or plan that "violated the law");[47] *Olivo*, 374 F. Supp. 2d at 548.  The purportedly common policy upon which Plaintiffs rely is that all MLOs "shared similar job duties and responsibilities, were paid in the same manner, worked more than forty hours per workweek, were classified as exempt employees and thus denied overtime pay, and were recently reclassified from exempt to non-exempt."  Pl. Brief at 9.  These allegations are not only inaccurate, but it is also clear that they do not state any <u>unlawful</u> decision, policy or plan.  Although Plaintiffs go to great lengths to state that they are not relying on MLOs' classification and reclassification alone, the classification of MLOs is the only plausible "decision, policy, or plan" identified by Plaintiffs.

---

[47] *Reeves* involved a determination on the merits following a bench trial, and the Court merely mentioned in dicta that <u>other</u> courts had conditionally certified collective actions based on mere allegations of a common, unlawful decision, policy or plan.  Unlike this case, the plaintiffs in *Reeves* actually alleged a single unlawful policy above and beyond the fact that the employer classified them as exempt.  The *Reeves* plaintiffs alleged that a specific disciplinary policy contained in a memorandum (the "Armbruster Memorandum"), which would require improper deductions from exempt employees' pay, was applied company-wide.  It was only after the bench trial that it became clear that the Armbruster Memorandum was only implemented in one of the defendant's locations, and not company-wide as the plaintiffs had alleged.  The Court therefore decertified the class except with respect to employees who worked under the same supervisor as the named plaintiffs.  Here, on the other hand, Plaintiffs have not alleged any common, unlawful policy above and beyond their classification as exempt employees, and it is clear from the outset that adjudicating their claims will require numerous individualized inquiries that make collective treatment inappropriate and inefficient.

The other First Circuit cases cited by Plaintiffs are similarly distinguishable.  *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357 (D. Me. 2010) (granting in part motion for conditional certification in off the clock case where plaintiffs' alleged a common unlawful policy by which all class members, who were located in two discrete locations, were given more work than could be completed within 40 hours, but were discouraged from recording overtime and were subject to the same scheduling, time recording, and compensation policies); *Litz v. Saint Consulting Group, Inc.*, No. 11-10693, 2012 WL 549057 (D. Mass. Feb. 17, 2012) (granting motion for conditional certification where defendant submitted no employee declarations in support of its opposition and argued primarily that plaintiff had not shown that other putative class members wished to join the action); *Poreda v. Boise Cascade, LLC*, 532 F. Supp. 2d 234 (D. Mass. 2008) (granting motion for conditional certification of discrete class of employees who were subject to a specific policy of paying overtime in arrears, and the differences the defendant pointed out among the class members were immaterial to this policy); *Melendez Cintron*, 363 F. Supp. 2d at 14 (<u>denying</u> plaintiffs' motion for conditional certification where plaintiffs failed to show they were similarly situated to proposed class members); *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212 (D. Mass. 2001) (granting motion for conditional certification of discrete class of only 50 people, all of whom had been subject to the same explicit policy under one particular contract).

However, as explained in Defendant's Motion to Set the Legal Standard Brief, there is nothing unlawful about an employer not paying overtime compensation to exempt employees. 29 U.S.C. § 213. Accordingly, RBS's classification of MLOs as exempt cannot alone be the glue that binds an FLSA class. *See* Motion to Set the Legal Standard Brief at 15-17; *see also, e.g., O'Donnell*, 429 F. Supp. 2d at 250 ("Under the FLSA, the question of whether an employee is properly exempted involves a fact-intensive inquiry into his/her job responsibilities and autonomy, the management style of the employee's supervisor and whether that employee worked over 40 hours per week. One cannot merely assume, as the plaintiffs have here, that [] employees throughout the country and corporate structure were subject to the same 'policy' of an allegedly improper exemption.") (emphasis added).

Plaintiffs also place strong—yet unwarranted—emphasis on the fact that RBS Citizens changed its compensation structure recently, so that its MLOs became overtime eligible, as alleged evidence that they are similarly situated for collective treatment. Pl. Brief at 5, 10. Plaintiffs' argument fails for several reasons. First, the decision to pay employees overtime compensation obviously is not an <u>unlawful</u> decision. Second, it is not unlawful or improper for RBS to pay exempt employees overtime, nor is there anything wrong with an employer acting conservatively to mitigate litigation exposure. *See, e.g., Clarke v. JPMorgan Chase Bank, N.A.*, No. 08-2400, 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010) (stating that employee reclassification "cannot establish an employer's liability for the period prior to the classification . . . the exempt status of a given employee depends upon an analysis of the employee's *job duties*"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) ("The fact that Safeco decided to re-classify all Claims Representatives . . . does not provide the necessary common thread" for treatment as a collective action; "[t]he merits of [plaintiff]'s claim will turn

upon evidence relating to [plaintiff]'s day-to-day tasks, and not upon any Safeco company policy or decision."); 29 C.F.R. § 541.604(a) (employers may pay overtime to exempt employees without losing the exemption). And third, to the extent Plaintiffs suggest that paying overtime to certain MLOs is nonetheless an admission of liability, such evidence is inadmissible as a subsequent remedial measure. *See* Fed. R. Evid. 407; *see also Liger v. New Orleans Hornets NBA Ltd. P'ship*, No. 05-1969, 2008 WL 348800, at *2 (E.D. La. Feb. 6, 2008).

Therefore, because Plaintiffs have failed to identify any common and unlawful decision, policy, or plan, Conditional Certification is not warranted. *O'Donnell*, 429 F. Supp. 2d at 250 (denying Conditional Certification where plaintiffs failed to show a common decision, policy or plan other than exempt classification); *Olivo*, 374 F. Supp. 2d at 548.

### 2. *Plaintiffs And Other MLOs Are Not Similarly Situated To Each Other.*

Moreover, Conditional Certification is inappropriate in this case because contrary to Plaintiffs' assertions in their motion and brief, the duties each MLO performs, how much time he or she devotes to each duty, how much time he or she spends outside the office engaged in potential sales activity, how many hours each MLO works, and the compensation each MLO receives vary significantly based on a host of factors. Each MLO runs his or her business differently, and it therefore follows that their duties vary in ways directly relating to the ultimate issue to be decided for each MLO: whether he or she was properly treated as exempt.

### a. MLOs Vary As To How They Generate Business And Whether They Predominantly Work Outside Rather Than Inside The Office.

MLOs who regularly spent time outside of the office generating business will likely qualify for the outside salesperson exemption. *See* FLSA 2006-11 ("[E]mployees of finance companies who obtain and solicit mortgages may be exempt outside sales employees if they are 'customarily and regularly' engaged away from the employer's place of business in obtaining

mortgages from brokers and individuals."); FLSA 2007-2 (confirming that regular selling or sales related activity outside the office "one or two hours a day, one or two times a week" satisfied the outside sales exemption test); *Taylor*, 2012 WL 10669, at *3-4 (financial advisors qualified for outside salesperson exemption and recognizing that spending only 10-20% of the time, or just one or two hours a day once or twice weekly, outside the office is sufficient for this exemption); *Lint*, 2010 WL 4809604, at *3 (plaintiff was an exempt outside salesman where he testified that "approximately 10-20 percent of his time was spent meeting with clients or prospective clients outside of the office and that the remaining 80 percent of his time was spent making calls in order to generate additional sales or training other sales agents").

To determine whether the outside sales exemption might apply, "courts must [ ] ask where the individual employees actually spent their time." *Wells Fargo*, 571 F.3d at 959 (refusing to certify a class of loan officers in a misclassification case because of the need for individual determinations as to how and where loan officers perform their duties); *see also* FLSA 2007-2 ("[E]ach 'sales force' loan officer *must be evaluated on an individual basis* to determine whether he or she qualifies for the outside sales exemption.") (emphasis added); *Clausman v. Nortel Networks, Inc.*, IP 02-0400, 2003 WL 21314065, at *4 (S.D. Ind. May 1, 2003) (granting defendant's motion to withdraw conditional certification order "where liability to each plaintiff will depend on whether that plaintiff was correctly classified as an 'outside salesman,' . . . [i]t is clear that each salesperson at Nortel operates differently.  It is precisely because these questions must be answered that the Court cannot approve notification of potential class members.").  Thus, depending on how each individual MLO goes about performing their job duties, MLOs may qualify as exempt in different ways.

As shown above, Citizens MLOs spend strikingly different amounts of time working outside the office on a variety of tasks.  Some MLOs claim they "never" worked outside the office, Ginter Decl. at ¶ 7 (Lukas Decl., Ex. L), other MLOs claim they meet with customers outside the office "on rare occasions," Kaufman Decl. at ¶ 7 (*Id.* at Ex. M), and other MLOs *choose* to spend a significant amount of time meeting with customers at their homes and workplaces in order to provide a higher level of personalized service.  *See, e.g.,* Ex. S, Vasic Decl. at ¶ 5 ("In order to deliver a high level of personalized service, I meet with 95% of my customers in-person at the location that is most convenient for them.  I meet with 60% of my customers in their homes, 5% of my customers at their businesses and/or places of employment, and the remainder at [a branch, her office], or, occasionally I meet with customers at a coffee shop or other public place."); *see also supra* at 3-4, 14-16.  Moreover, Plaintiff Rogers and many other MLOs also spent a significant amount of time outside the office generating business for Citizens by visiting and having meals with referral sources like realtors, CPAs, financial planners, and attorneys, attending open houses and closings, and attending community events.  *See supra* at 3-4, 14-16.[48]

---

[48] *See also* Ex. E, Dier Decl. at ¶ 8 ("Overall, I would estimate that I spend 40% of my time on average working out in the field generating business for Citizens by networking, marketing, and meeting with customers and agents at their offices and homes."); Ex. M, Quon Decl. at ¶ 4 ("I spend between 25% and 50% of my time out in the community generating business for Citizens through sales calls at my strategic partners' and clients' offices, dinner and informational meetings with my strategic partners, delivering food to my strategic partners, attending community meetings, and working on several local committees."); Ex. R, Stulpin Decl. at ¶ 4 ("On average, I have spent approximately 35% of my time working out in the community away from Citizens locations and my home."); Ex. Q, Sonsini Decl. at ¶ 5 ("Although my schedule is different every week, I spend approximately 35% of my time out in the field generating new business by meeting with clients, picking up documents from my clients, attending closings, attending open houses, and meeting with my outside referral sources."); Ex. S, Vasic Decl. at ¶ 7 ("Overall, I have spent 30-40% of my time working out in the community away from my home, the Hinsdale office, and the Park Ridge branch."); Ex. J, Marcus Decl. at ¶¶ 4, 6 ("I spend about 1/3 of my work time out in the community generating business for Citizens . . . [by] visiting realtors at their offices and dropping off marketing materials, working with nonprofits that support first time homebuyers, attending and presenting at first time homebuyer seminars, entertaining my referral sources at golf outings or dinners, and attending open houses."); Ex. P, Rozyczka Decl. at ¶ 7 ("The amount of time I spend out in the field varies from week to week.  On average, I spend at least 25% of my time working out in the field."); Ex. O, M. Rogers Decl. at ¶ 3 ("As a mortgage loan officer I am responsible for

(Footnote Continued)

These MLOs explain that <u>they decide</u> the best way to generate business for Citizens, and the amount of time they spend generating business out in the field varies based on numerous factors, including their experience as a loan officer, the availability of bank branch space for customer meetings, their specialty areas, and pure personal choice. *See id.*; *see also, e.g.,* Ex. E, Dier Decl. at ¶¶ 3-4 ("At Citizens, I work very independently and it is up to me to decide where I work and how I go about generating business. The New York real estate market is unique because it is largely driven by real estate attorneys rather than realtors. I choose not to cover any Citizens branches because I feel that I can be more successful by fostering relationships with real estate attorneys and other referral sources . . . ."); Ex. I, Klender Decl. at ¶¶ 5, 6, 8 ("I work very independently. It is generally up to me how I go about generating business and I set my own schedule. . . . I currently spend approximately 30-40% of my time working out in the community away from my office and branches generating business and meeting with customers. I am not able to meet with customers at bank branches after banking hours, so I meet with a lot of customers at public places like coffee shops or sometimes at their lawyers' offices. When I was able to meet with clients in bank branches after hours, . . . I still spent about 15-20% of my time out in the community generating business and meeting with customers" and "[l]ess experienced loan officers should spend even more time working out in the field building up their referral bases"); Ex. L, Phillips Decl. at ¶ 8 ("I spend time generating business out in the community every week, but the amount of time has varied since I have been with Citizens. Recently, I have been spending 10-15% of my time working outside in the community. Before a year and a half ago, I was spending at least 40-50% of my time working outside in the community cold calling

---

developing outside contacts in order to bring in new loans to Citizens. I spend at least 25-30% of my time each month outside of my home and my branch bringing in business for Citizens, and 100% of my business is self-sourced.").

my referral sources, going to lunch with them, and doing other sales activities.  My goal is to increase my time outside of the office to at least 25-30% because the business is done outside, not in an office.").

Thus, the applicability of the outside sales exemption requires the Court to determine—for each loan officer—whether he or she was "regularly engaged away from the employer's place or places of business," 29 C.F.R. § 541.500(a)(2), a question that has a different answer for each MLO.  Indeed, even a single MLO may have spent differing amounts of time performing his or her duties outside a RBS office depending on the particular time period.  *See e.g.,* Ex. I, Klender Decl. at ¶ 6; Ex. L, Phillips Decl. at ¶ 8; *see Gromek v. Big Lots, Inc.,* No. 10-4070, 2010 WL 5313792, at *3-5 (N.D. Ill. Dec. 17, 2010) (denying conditional certification and pointing to earlier finding that job duties may vary over time).

### b. MLOs Vary In Other Significant Ways That Affect Whether They May Qualify For Various White-Collar Exemptions.

MLOs' job duties, compensation, work locations, and management also varied in significant ways that affect whether they may qualify for the administrative, highly compensated, and/or combination exemptions.  For example, while some MLOs were paid a bi-weekly draw that did not exceed $455 per week, *see, e.g.,* Reynolds Decl. at ¶ 12 (Lukas Decl., Ex. Q); Wlodarski Decl. at ¶ 11 (*Id.* at Ex. W), other MLOs were paid a guaranteed salary that exceeded $455 per week for their entire length of employment with Citizens.  *See, e.g.,* Ex. C, Clousson Decl. at ¶ 4; Ex. B, Ocko Decl. at ¶ 12; *see also supra* at 3-4, 14-15.  Other MLOs were paid a guaranteed salary that exceeded $455 for part of their employment with Citizens.  *See, e.g.,* Ex. M, Quon Decl. at ¶ 5 (received salary of $9,000 per month for first four months with RBS Citizens); *see also supra* at 3-4, 14-15.  Thus, some individual MLOs may qualify for the

administrative, highly compensated, or combination exemptions during all or part of their employment with RBS Citizens.

Moreover, many MLOs are highly compensated, with some earning more than $500,000 per year. *See supra* at 3-4, 14-15. MLOs who meet the salary basis test for all or part of a year and who earned more than $100,000 in that year may qualify for the highly compensated employee exemption if he or she regularly performed just *a single exempt duty*. 29 C.F.R. § 541.601(a). Thus, the analysis will vary for each MLO who earned greater than $100,000 in a year versus those who earned less. *See supra* at 14-15; *see also, e.g.,* Ex. T, Von Flatern Decl. at ¶ 5, 10 (earned more than $100,000 every full year he has worked for Citizens and spends 40-50% of his time advising customers and analyzing their financial information). These wide differences in compensation also affect each MLO's regular rate of pay and, thus, whether he or she qualifies for the retail services exemption in any workweek. *See Johnson*, 2005 WL 1994286, at *6.

Furthermore, the level of discretion each MLO exercises in the performance of his or her duties as well as the amount of time each MLO spends analyzing financial information and advising clients directly affects whether that MLO may qualify for the administrative, highly compensated, and/or combination exemptions. *See* 29 C.F.R. § 541.200(a)(3); 29 C.F.R. § 541.203(b); 29 C.F.R. § 541.500(a); FLSA 2006-31; *Perry v. U.S. Bank*, No. 00-1799, 2001 WL 34920473, at *5-6 (N.D. Cal. Oct. 16, 2001) (certification denied when one of the differing job duties was "the style of the individual personal banker in offering financial advice and analysis to clients"). Although Plaintiffs seem to characterize themselves as glorified paper-pushers, other MLOs regularly exercise significant discretion and independent judgment in different ways and spend significant amounts of time analyzing their clients' financial

31

information and advising them about their options. *See supra* at 16-17;[49] *see also Becton* (Ex. A, Holbrook Decl., at Ex. 6) (denying plaintiffs' motion to conditionally certify a nationwide class of MLOs in part because "[t]he MLOs who gave declarations explained that they exercised discretion about where they work – at least some of them did – and when they work[,]" and thus some MLOs may qualify for the administrative exemption).

Finally, even if a MLO were misclassified, there would be no liability with respect to that MLO unless he or she actually performed more than 40 hours of work in one week. Plaintiffs vague and uniform statements that they "frequently" or "routinely" worked more than 40 hours per week without specifying exactly how many hours—let alone a range of hours—begs individualized questions as to whether any of these MLOs actually performed more than 40 hours of work, and if so, how much more. *See supra* at 17-18. Meanwhile, other MLOs testify that they set their own work schedules, their work varied hours from week to week, and they sometimes worked fewer than 40 hours, which further shows the sorts of individualized inquiries that will be necessary to adjudicate each class member's claim. *See id.* The number of hours that a MLO worked in any particular week also affects whether he or she qualified for the retail services exemption. To determine a MLO's regular rate of pay for the exemption, one must

---

[49] *See also* Ex. K, Monroe Decl. at ¶ 8 ("I use my judgment and discretion every day. I use it when I prioritize my tasks and manage my time. I also use it when I decide which home equity products are available to each customer, and when I decide the best way to structure a deal to meet each customer's needs."); Ex. R, Stulpin Decl. at ¶ 7 ("My job is not a cookie-cutter job. Citizens offers a myriad of loans, and it is my responsibility to gather the necessary financial information from my customers and use my expertise to determine which product will work best for them. Especially in the current, highly-regulated mortgage industry, this process requires a large knowledge base and a lot of thought, foresight, and judgment calls."); Ex. S, Vasic Decl. at ¶ 8 ("An important part of originating loans is analyzing my clients' financial information and advising them about the loan options that may best fit their needs. I think it is important to conduct an in-depth analysis of each client's financial circumstances and financial goals so that I can educate them about all of their options and help them decide which option is best for them. Sometimes it can take days to analyze a client's financial information, such as when they are self-employed and own multiple properties."); Ex. 7, Von Flatern Decl. at ¶ 7 ("I use my judgment in many ways while performing my job. I have discretion in some instances to decide whether to pre-approve a loan, or whether to pre-approve a loan without seeing certain documentation. I also use my judgment when I analyze my customers' financial information, advise my customers about their options, and coach my ineligible customers about strategies for becoming eligible for a mortgage loan.").

calculate the wages the employee received for a week divided by the hours worked that week. *See* 29 C.F.R. § 779.419; *see also, e,g., Missel v. Overnight Motor Transp. Co.*, 126 F.2d 98, 110 (4th Cir. 1942).   Wide variations in the number of hours MLOs worked affect each MLO's qualification for the exemption *in any particular workweek*.

Thus, Plaintiffs and the putative class members are not similarly situated, and whether any particular MLO performed the same "unpaid work" that Plaintiffs allege requires numerous individualized inquiries unsuitable for class treatment.   *See generally MacGregor v. Farmers Ins. Exchange*, No. 10-3088, 2011 WL 2981466, at *2 (D.S.C. July 22, 2011) ("If individualized determinations are likely to predominate, collective action will hinder, rather than promote efficient case management, and thus notice should not be granted."); *Becton* (Ex. A, Holbrook Decl., at Ex. 6 at 30) (describing how MLOs' hours varied "[a]nd that's, in fact, what this case is all about").

> **D.      The Court Should Deny Court-Authorized Notice And Strike All Opt-In Forms Filed Due To Plaintiffs' Counsel's Pre-Certification Solicitation Of Putative Class Members.**

As explained above, Plaintiffs and their counsel chose to engage in a massive extrajudicial notice process of their own before and after filing this lawsuit.   This notice campaign included mailing solicitation letters to numerous RBS Citizens MLOs, creating a website dedicated to this lawsuit with a pre-populated opt-in form, and issuing press releases advertising this lawsuit on various websites, including PRWeb.com.   *See supra* at 11-12.   Plaintiffs are asking the Court for a second crack at convincing RBS Citizens MLOs to participate in this action with the imprimatur of the Court.   Allowing Plaintiffs' counsel to send a second, or in some instances a <u>third</u>, notice of this lawsuit to Citizens MLOs, now stamped with the imprimatur of the Court, runs the serious risk of suggesting to these MLOs that the suit in fact has merit.   *See* Ex. Q, Sonsini Decl. at ¶ 6 ("I have received two letters about this lawsuit in the mail, but I decided not to join . . . .").   Because

33

Plaintiffs' counsel have already pursued their own solicitation campaign, any Court-facilitated notice should be denied, and any opt-ins already filed as a result of this solicitation should be stricken.  *See Melendez Cintron*, 363 F. Supp. 2d at 15 (denying Conditional Certification and striking opt-in consent forms from the record where plaintiffs engaged in a similar extra-judicial notice campaign because "Plaintiffs failed to request authorization from this Court to give notice to the potential class members" which was "against established case law precedent of district courts in the First Circuit"); *Chemi*, slip. op. at 18 (citations omitted) (Ex. A, Holbrook Decl., at Ex. 5) ("[P]laintiffs cannot have their cake and eat it too.  That is, they cannot be heard to complain that they want the court to assist in providing notice, while at the same time engaging in conduct that amounts to an organized method to notify potential plaintiffs of an FLSA claim, without any oversight from the Court or defendants."); *Pfohl v. Farmers Ins. Group*, No. 03-3080, 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) (denying notice when plaintiff's solicitation failed to come up with significant numbers of allegedly similarly situated employees).

**V.      Plaintiffs' Proposed Notice Is Inappropriate.**

    If the Court does conditionally certify a class—which it should not—Defendant respectfully asks that the Court deny Plaintiffs' request to utilize the biased and misleading Proposed Notice attached to their Motion.  A few of the most glaring flaws in Plaintiffs' Proposed Notice are:

- The Notice fails to state that the basis for Plaintiffs' claims is their allegation that RBS Citizens misclassified MLOs as exempt employees.  As a result, the Notice implies that all MLOs were entitled to overtime and that the only issue to be decided in the litigation is whether overtime was actually paid.

- The Notice should contain a <u>prominent</u> statement on the first page regarding the Court's

neutrality and the case caption should not appear on the notice. *See, e.g., Knispel v. Chrysler Group LLC*, No. 11-11886, 2012 WL 553722, at *7 (E.D. Mich. Feb. 21, 2012) ("The purpose of the notice is to provide potential plaintiffs with a neutral discussion of the nature of the action. In that regard, the Court concludes that the statement indicating that the Court has not taken a position as to the litigation should appear on the first page of the notice. The case caption shall not appear on the notice.") (internal citation omitted); *Howard v. Securitas Security Servs., USA Inc.*, No. 08-2746, 2009 WL 140126, at *10 (N.D. Ill. Jan. 20, 2009) (requiring a statement regarding the court's neutrality and not to direct inquiries to the clerk or court to appear immediately above the introduction on the front page).

- The Notice fails to state Defendant's position in the litigation. *See, e.g., Knispel*, 2012 WL 553722, at *7 ("The Court also concludes that the notice should have a more balanced statement of Defendant's position in this litigation—consisting of more than a single line indicating Defendant denies the allegations.") (internal citation omitted).

- The Notice fails to advise the recipients of the possibility that they may be required to travel to the District of Rhode Island to be deposed and/or participate in a trial if they opt in and that they may be required to pay costs if they do not prevail. *See, e.g., Jancich,* 2012 WL 380287, at *3-4 (requiring plaintiffs to include language that opt-ins may be required to travel to Kansas for depositions and/or trial and to pay costs if they did not prevail).

- The opt-in period should not exceed 30 days. *See, e.g.*, *Keef v. M.A. Mortenson Co.*, No. 07-3915, 2008 WL 3166302, at *3 (D. Minn. Aug. 4, 2008) (limiting opt-in period to 30 days); *Kaiser v. At The Beach, Inc*., No. 08-586, 2009 WL 4506152, at *5 (N.D. Okla. Nov. 24, 2009) (limiting opt-in period to 30 days where plaintiffs already "largely concluded the notification process" prior to conditional certification). Court-authorized notice is not an

indefinite opportunity for Plaintiffs' Counsel to drum up business.

Further, if the Court orders notice, RBS Citizens respectfully requests that the Court direct the parties to submit a mutually agreeable notice within 30 days of the Court's Order.  If the parties cannot agree, they should submit their separate proposals for the Court's decision.  *See Tidd v. Adecco USA, Inc.*, No. 07-11214, 2008 WL 4286512, at *5 (D. Mass. Sept. 17, 2008) (ordering the parties to confer regarding a proposed joint notice, or to submit their respective versions of the proposed notice if they were unable to agree).  If the Court does not order the parties to jointly submit a proposed notice, then RBS respectfully requests the opportunity to address in more detail the issues regarding the content, procedures for, and timing of any such notice.  For example, because of the private nature of the information requested, to preserve impartiality, and prevent Plaintiffs' counsel from exploiting notice to solicit clients, a third-party administrator should be retained.  *See Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1128-29 (N.D. Cal. 2009) (ordering collective action notice to be distributed by a third-party administrator rather than plaintiff's counsel); *In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, MDL No. 1743, 2009 WL 248677, at *4 (D. Colo. Feb. 3, 2009) (finding third-party administrator was appropriate "to protect the integrity of the process . . . ."); *Robinson*, 2009 WL 4018560, at *5 (plan for issuing notice "should include safeguards for the privacy of potential class members, such as a requirement that notices be mailed by a neutral third-party administrator").

Finally, if this Court does conditionally certify a collective action and permit notice, it should also deny Plaintiffs' attempt to invade employees' privacy by obtaining their e-mail addresses.  Plaintiffs' counsel do <u>not</u> represent any individual who has not opted into the action, and none of these absent putative class members' email information is necessary to provide notice

of this action.   Providing e-mail addresses for all putative collective action members—if RBS even had them—is unwarranted not only due to privacy concerns, but because electronic notice can be altered and forwarded to other people or otherwise be egregiously abused.   *E.g.*, *Espenscheid v. DirectSat USA, LLC*, No. 09-625, 2010 WL 2330309, at \*14 (W.D. Wis. June 7, 2010); *Reab v. Electronic Arts, Inc.*, 214 F.R.D. 623, 631-32 (D. Colo. 2002) ("In contrast, electronic communication inherently has the potential to be copied and forwarded to other people via the internet with commentary that could distort the notice approved by the Court.   Electronic mail heightens the risk that the communication will be reproduced to large numbers of people who could compromise the integrity of the notice process. In addition, email messages could be forwarded to nonclass members and posted to internet sites with great ease. First class mail ensures, at the outset, that the appropriately targeted audience receives the intended notification and maximizes the integrity of the notice process.").   Indeed, courts regularly find first class mail sufficient to place putative collective action members on notice.   *E.g.*, *Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 765 (W.D. Tenn. 2011) ("In FLSA cases, first-class mail is generally considered to be the best notice practicable to ensure that proper notice is received by potential class members.") (internal quotation and citation omitted).

## VI.   CONCLUSION

For the foregoing reasons, Defendant RBS Citizens, N.A. respectfully requests that the Court deny Plaintiffs' Motion for Conditional Certification.   Alternatively, if the Court were to grant certification and authorize notice, Defendant requests that the Proposed Notice be denied, and that the Court order the parties to meet and confer concerning the notice to be issued.

Dated:  July 9, 2012                          Respectfully submitted,

                                              */s/ Todd S. Holbrook*
                                              MORGAN, LEWIS & BOCKIUS
                                              Todd S. Holbrook (R.I. #6758)
                                              225 Franklin Street, 16th Floor
                                              Boston, Massachusetts 02110
                                              Telephone:  617.341.7700
                                              Fax:          617.341.7701
                                              tholbrook@morganlewis.com

                                              Samuel S. Shaulson (*pro hac vice*)
                                              101 Park Avenue
                                              New York, New York 10178
                                              Telephone:  212.309.6718
                                              Fax:          212.309.6001
                                              sshaulson@morganlewis.com

                                              Sarah E. Bouchard (*pro hac vice*)
                                              1701 Market Street
                                              Philadelphia, PA  19103-2921
                                              Telephone:  215-963-5077
                                              Fax:          215-963-5001
                                              sbouchard@morganlewis.com

                                              *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Todd S. Holbrook, hereby certify that on July 9, 2012, I electronically filed

Defendant's Opposition to Plaintiffs' Motion for Conditional Certification, with exhibits, with

the Clerk of Court using the CM/ECF system which will send notification of such filings to all

counsel registered for ECF service, and I hereby certify that on that same date, I mailed by

United States Postal Service, the same documents to all appearing non-registered counsel.

*/s/ Todd S. Holbrook*
Todd S. Holbrook