# EXHIBIT 6

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   MICHAEL BECTON, et al.,        )
                                    )
 5              Plaintiffs,         ) Docket No. 11 C 331
                                    )
 6         vs.                      )
                                    )
 7   JPMORGAN CHASE & CO.,          ) Chicago, Illinois
                                    ) April 11, 2011
 8              Defendant.          ) 2:08 p.m.

 9
        TRANSCRIPT OF PROCEEDINGS - Oral Argument
10      BEFORE THE HONORABLE REBECCA R. PALLMEYER

11
     APPEARANCES:
12

13   For the Plaintiffs:    MADUFF & MADUFF, LLC
                            BY: MR. AARON B. MADUFF
14                          205 North Michigan Avenue, Suite 2050
                            Chicago, Illinois  60601
15

16   For the Defendant:     MORGAN, LEWIS & BOCKIUS LLP
                            BY: MR. THOMAS F. HURKA
17                          77 West Wacker Drive
                            Chicago, Illinois  60601
18
                            O'MELVENY & MYERS
19                          BY: MR. SAMUEL S. SHAULSON
                            Times Square Tower, 7 Times Square
20                          New York, New York  10036

21

22
     Court Reporter:        FRANCES WARD, CSR, RPR, FCRR
23                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2118
24                          Chicago, Illinois  60604
                            (312) 435-5561
25                          frances_ward@ilnd.uscourts.gov
```

---

Page 2

1   THE CLERK: 11 C 331, Becton versus JPMorgan Chase
2   for oral argument.
3   MR. MADUFF: Good afternoon, your Honor.
4   Aaron Maduff on behalf of the plaintiffs.
5   THE COURT: Good afternoon.
6   MR. HURKA: Good morning, your Honor.
7   Tom Hurka on behalf of defendant.
8   THE COURT: Good afternoon.
9   MR. SHAULSON: Good afternoon, your Honor.
10  Sam Shaulson also on behalf of the defendant.
11  THE COURT: All right. We are here for arguments
12  on plaintiffs' motion for judicially supervised notice to a
13  collective class of loan officers for JPMorgan Chase. It's
14  fully briefed. I have gotten briefs on both sides and
15  response and even a surreply, which I have had a chance to
16  review.
17         I know there is one issue that we will want to at
18  least touch on, is the question of whether the determination
19  out in California has collateral estoppel effect for this
20  case. And then whether that's true or not true, we would
21  probably want to take a quick look, it seems to me, on the
22  question of whether the plaintiff has made enough of a
23  showing that there is a group of people in the same
24  circumstances.
25         Mr. Maduff, your brief suggests that the showing

---

Page 3

1   that needs to be made is very limited. I will certainly
2   agree with you that it's not at the same level of a Rule 23
3   class. But I am not quite sure that simply to say loan
4   officers have the same job descriptions nationwide is
5   sufficient. So I hope you will talk about that.
6          We can take maybe ten minutes per side, and I will
7   ask you any questions I may have.
8   MR. MADUFF: Very good. Do you want me to start,
9   your Honor?
10  THE COURT: Sure.
11  MR. MADUFF: I will start with that standard very
12  briefly.
13         From *Lemus v. Burnham*, at the first or notice stage
14  the court usually relies on the pleadings and any affidavits
15  submitted and applies a lenient standard, which typically
16  results in conditional certification of a representative
17  class.
18         This isn't a typical case. We have got lots more
19  than just affidavits, which would do the trick supporting the
20  allegations.
21         I will get into that in a few moments. I think
22  maybe it would be better to address *Trinh* first, unless you
23  would like me to do that first.
24  THE COURT: Either one.
25  MR. MADUFF: We have already talked about the fact

---

Page 4

1   that the burden is minimal. And in this case the putative
2   class is specifically identified by their incentive pay plan.
3          The individuals classified under job code HSRTKA, I
4   have from John Kostelny's affidavit -- and I can hand this up
5   to you if you would like to see it, but you should have it in
6   front of you -- the incentive statement in detail, resale
7   {sic} sales In-Footprint loan officer, Job Code HSRTKA.
8   That's what we have that puts this together.
9          And if you look at his declaration and, of course,
10  the exhibits that go with it, he has stated for you in
11  Paragraph 7 the plan itself.
12         The plan says, "All full-time and part-time
13  employees in the job code listed in the table below are
14  considered participants and eligible to earn incentives
15  described in this plan." And again the job code is HSRTKA.
16         Now, that's the class that we are seeking to have
17  certified as a putative collective.
18         What JPMorgan has done is tried to change the
19  subject and talk about *Trinh*, and JPMorgan has said, well, we
20  have collateral estoppel, and if we don't have collateral
21  estoppel, it's persuasive.
22         Well, this is not *Trinh*. And, in fact, the reason
23  the Southern District of California used in denying *Trinh*
24  makes a certain amount of sense. The class up there was all
25  loan officers. And with their materials, defendants have

5

1  presented declarations from loan officers generally, retail
2  loan officers, loan managers, prime loan officers, subprime
3  loan officers, loan managers, subprime lending managers, and
4  senior loan officers.
5       Ironically, the one kind of loan officer they
6  didn't include was an In-Footprint loan officer. The first
7  reason for it -- and I finally figured this out on Thursday,
8  your Honor -- is that the In-Footprint loan officers in this
9  HSRTKA weren't created until 2008. *Trinh* was filed in 2006.
10 Now, I don't have any documentation on that. JPMorgan can
11 address that issue.
12      And the fact is that they didn't give us any
13 In-Footprint loan officers particularly surprised me given
14 that they had a surreply after we had pointed out that we are
15 talking about In-Footprint loan officers and we are talking
16 about job code HSRTKA.
17      Now, I concede that In-Footprint loan officers are
18 a subclass of loan officers generally. That doesn't make it
19 the same subject.
20      Let's take an analogy. Let's assume that somebody
21 had gone to Judge Gottschall and said, Judge, I want to
22 certify a class of all residents in the United States because
23 they are residents in the Central time zone. And she says
24 no. You can have residents in the United States that are
25 outside the Central time zone.

6

1       Now we come back to you, and we say, Judge, we got
2  a subclass; that is, residents of the State of Illinois, and
3  they are residents of the Central time zone.
4       Well, the answer to that is yes. The fact that
5  they happen to also be residents of the United States does
6  not create collateral estoppel. The issue is different.
7       And this is a subclass. It is specifically -- and
8  I will repeat myself -- but it's specifically those in job
9  code HSRTKA, and they are In-Footprint loan officers.
10      Now, to take it a step further, again something I
11 was able to check last week -- and again, I don't have it in
12 front of me. But loan officers in *Trinh* were about 5,000.
13 In-Footprint loan officers, again, is a subclass. I
14 understand it now to be about 2500.
15      They didn't exist at the time of *Trinh*, so they
16 couldn't have been the issue of *Trinh*. And given the
17 information that we do have about *Trinh* -- and I don't have
18 their materials. I have only what JPMorgan provided. It
19 makes sense that you have got all kinds of loan officers
20 doing all kinds of different things from all kinds of
21 different subgroups, and *Trinh* makes a certain amount of
22 sense.
23      But this is not 16 different kinds of loan
24 officers. It's In-Footprint loan officers.
25      Now, going into the -- before I go to the specifics

7

1  of this case, we have to take a look at the collateral
2  estoppel in terms of what they have to show. And the burden
3  is on JPMorgan for the collateral estoppel.
4       They have to show that it's the same issue, and not
5  only that it's the same issue, but that it was critical to
6  the decision in *Trinh*.
7       Well, In-Footprint loan officers never appears in
8  *Trinh*. It doesn't appear there, as we said, because it
9  didn't exist in 2006.
10      The documents that they gave us, the declarations,
11 don't include HSRTKA. And In-Footprint loan officers don't
12 appear anywhere there. It's not just a subclass. It's a
13 different class that didn't even exist.
14      And again, they did a surreply after we pointed all
15 of this material out.
16      Clearly, since *Trinh* didn't address the question of
17 various kinds -- since it addressed the questions that loan
18 officers were similarly situated, it did not address the
19 question we have here.
20      So certification in this case. The question is,
21 are the named plaintiffs and the putative class similarly
22 situated? And we have already talked about the standard
23 being lenient.
24      Last week you mentioned some question in your mind
25 about whether you were perceived as employee friendly. And

8

1  it hit me later that when we filed this case, we didn't know
2  who we were going to get in this district. There are some
3  judges who are more employee friendly and some that are less.
4       But across this district what we find is that the
5  standard is lenient, and all we need is to find out whether
6  there are allegations sufficient for the Court to envision a
7  scenario where the representative plaintiff and the putative
8  plaintiffs are similarly situated. That's from Judge Kocoras
9  in *Persin v. Careerbuilder*.
10      This case is remarkable in the amount of material
11 that we have been able to provide in support. You have the
12 declarations. That's normally what you get. They are
13 consistent in describing the job, and we have the pay plan
14 that they have. We have the job postings.
15      This is from JPMorgan. Normally a plaintiff
16 wouldn't have this, but we found it on line. The job
17 postings show that they have got lots of employees out there,
18 164 job postings across the country, and they within it list
19 In-Footprint loan officers. And they present the identical
20 job descriptions.
21      But let's go to the really big piece, the one that
22 binds it up, because the question is, is there a factual
23 nexus that binds them on how they are paid? And the
24 incentive pay plan does that.
25      It's a common pay plan that goes to all of the

9

people that we seek to have certified. And the parameters within that pay plan are very carefully done. It's their job code, HSRTKA. That pay plan in and of itself is what binds everybody, and that I think is just an ace in the hole. It's a trump card all the way. But we have all this other material.

The other thing we have is two other cases that show that there are people who are similarly situated.

It's rather ironic that JPMorgan has taken opposite positions in two motions before this court.

In response to this motion, JPMorgan has argued that the group for which we are seeking putative certification are not similarly situated. While at the same time JPMorgan had a motion to dismiss pending in which it argued that the *Martinez* case was identical. If there aren't others similarly situated out there, how could the *Martinez* case be the same case? They are alleging the same things.

Now, I confess that I wasn't aware of *Martinez* at the beginning, and I wasn't aware of the fact that there is even a single plaintiff case, which name I don't have in front of me, but there is actually a second case in Dallas where there are one or two single plaintiffs that did not seek a class. But JPMorgan gave us that. They showed us that this is the same.

In addition, you have 14 consents from similarly

10

situated employees in four different states.

The first stage, certification, is very lenient. Given all of this information, even without the benefit of discovery -- I mean, that could change things -- this is strong enough for Rule 23 certification. We are not even at the second stage of decertification.

From Judge Kocoras again, what we have to allege is that the plaintiff and other account managers and representatives shared some fundamental employment characteristics beyond job titles. In this case that's the pay plan.

This is sufficient to allow us to authorize notice of the lawsuit to putative collection action plaintiffs. That's again out of his opinion in *Persin*.

The kind of evidence that's normally expected at this stage is the affidavit, the complaint, and the consents. What you have, you have the affidavits or the declarations. They are consistent describing the pay practice, but you have got all of these other things.

At this stage of the analysis that's all that's required.

At the first or notice stage the court usually relies on the pleadings and any affidavits submitted and applies a lenient standard, which typically results in conditional certification, as I said before.

11

In *Fisher v. Michigan Bell*, the court noted that at this first stage the notice standard is lenient, requiring only that the plaintiff submit evidence establishing at least a colorable basis for their claim that a class of similarly situated plaintiffs exist.

In other words, so long as there is anything on which a court can rely on certification, it's going to be the norm in this district. This is a lot more than what you would normally have.

So is there a factual nexus that binds potential class members? At this stage of the analysis the cases are normally certified, as I said, to see if we have a pay plan, we have the job descriptions, we have the code. And that's what we are using here, the HSRTKA.

Now, one of the things that JPMorgan said in its surreply was, well, they can't make up their mind. In their complaint they said loan officers. In their notice they say loan officers. Now they say -- in the motion they say In-Footprint loan officers and they give the code.

Well, let's look at what happened here. We have several people come into our office giving us the same story, and they are loan officers.

When we start -- when we prepared the complaint we need to get it on file immediately because we have got a statute of limitations ticking away, and we start to do more

12

examination when we file the notice motion. And what we find is these are In-Footprint loan officers. That's what's binding them together, and they have got this incentive pay plan.

So they didn't have that in front of us at the time. And what we have done is on notice motions we said, here is the group. It is those people classified pursuant to job code HSRTKA. That's where the notice is going out to.

Given that our plaintiffs didn't recognize that themselves, it doesn't make a whole lot of sense to send a notice out to all of these people saying HSRTKA. They are going to look at the notice and say, does this even apply to me?

We know it applies to them because JPMorgan will give us the addresses of those people under HSRTKA, and that's who it goes to. Now what we say on it is "loan officer," so that they know, yes, I am a loan officer, and I can participate in this case.

And that's for the simple clarity sake because these people have the right to join the case, and they should be able to look at it and say, gee, I have a right here that I want to exercise rather than doing it in a code that they are not going to understand simply because that code is the definition of the class. And that's why you have those distinctions.

### Page 13

1  THE COURT: A couple more minutes and then I want
2  to hear from the defendant.
3  MR. MADUFF: Okay.
4  JPMorgan has ignored the relevant issue here:
5  whether there is a common nexus. Instead, it simply argues
6  that misclassification isn't enough. Well, that was enough
7  of a commonality for them to pay these people the same way.
8  To quote from Judge Guzman, "The court does not
9  agree with defendant that determining the application of an
10  exemption will necessarily require an inquiry with respect to
11  the job duties of each plaintiff."
12  So are we now going to create a policy that so long
13  as the company consistently misclassifies its employees can
14  avoid putative certification? If we are, we are going to
15  create one heck of an incentive for companies to simply
16  misclassify everybody.
17  To be real, though, this court -- this district has
18  already spoken in *Rottman*, and this is loan officers.
19  Old Second maintains that determining whether given
20  class members meet these criteria will necessitate
21  individualized inquiries into the nature of each loan
22  officer's employment.
23  For example, Old Second claims that it will be
24  necessary to consider the job duties actually performed by
25  each loan officer on a daily basis, the time spent, et

### Page 14

1  cetera.
2  Since these determinations cannot be made on an
3  individual -- on a class-wide basis, Old Second claims the
4  suit should not be certified.
5  This argument -- this is out of *Rottman*. "This
6  argument is premature at this stage of the litigation.
7  Courts have consistently held that questions about
8  applicability of FLSA exemptions are typically not addressed
9  during the first step of conditional certification inquiry."
10  If you want the page cite, that's Page 991 to 992, 735 F.Supp
11  2d 998 -- excuse me -- 988.
12  THE COURT: 988. Thank you.
13  MR. MADUFF: Yes.
14  THE COURT: For defendant.
15  MR. SHAULSON: Thank you, your Honor.
16  Your Honor, it's plaintiffs' burden to demonstrate
17  that class certification is appropriate and that notice
18  should go out to thousands of JPMorgan Chase loan officers.
19  This is not automatic. The court should only grant notice if
20  it would be judicially efficient to do so.
21  And as Judge Gottschall mentioned in the *Howard v.*
22  *Securitas Securities* case, the plaintiffs' burden is not a
23  mere formality. As courts within this circuit and elsewhere
24  have noted, it would be a waste of the court's and the
25  litigants' time to grant certification to a large and diverse

### Page 15

1  class only to later determine that collective action
2  certification is not appropriate.
3  And it bears mentioning your Honor's decision in
4  *Harper v. Yale International Insurance* where the Court
5  observed that the whole purpose behind an opt-in requirement
6  was to limit class certifications, to limit collective
7  certifications.
8  So having plaintiffs' counsel come in and say in
9  any case where there has been a classification of employees
10  as except, we should be able to certify, that would go
11  against the entire congressional intent in promulgating
12  Section 216(b).
13  Now let me talk about the issues that you
14  addressed.
15  First is the class definition.
16  Plaintiffs' class definition is unascertainable.
17  Plaintiff has the burden of establishing a well-defined class
18  that is capable of being determined with reasonable
19  administrative ease. This is how they have defined their
20  class because they are trying to get around the
21  individualized issues, and they are trying to around *Trinh*.
22  So they define their class as In-Footprint loan officers who
23  "sell mortgage products from within a branch as opposed to
24  outside the branch."
25  They know the job description says you can do your

### Page 16

1  job both inside the branch and outside the branch. So they
2  are trying to limit it to those loan officers In-Footprint
3  who were within the branch.
4  Well, just defining who's in the class and who
5  should get notice would require an individualized analysis,
6  which is not suitable for class treatment.
7  Let me talk about the similarly situatedness
8  standard.
9  It's plaintiffs' burden to prove that the class --
10  members of the class were subject to a common and unlawful
11  policy. And that comes straight from *Flores v. Lifeway*
12  *Foods*.
13  Judge Gottschall in *Howard v. Securitas Security*
14  rejected cases from out of this district and out of this
15  circuit that said the courts can't consider the disparate
16  factual circumstances in employment settings and the
17  defendants' defenses in terms of adjudicating stage one
18  certification under the FLSA.
19  Judge Gottschall said that the courts should "Weigh
20  the evidence in the record without any artificial
21  bifurcation."
22  He further went on to say that, contrary to what
23  Mr. Maduff just argued, the court has no obligation to accept
24  the plaintiffs' statements as true and is obligated to
25  consider all the evidence in the record, including any

17

1  oppositional affidavits.
2      The burden is not met by simply pointing to a
3  common job title, a common job code, a common job
4  description. And what difference does it matter that
5  thousands of loan officers participated in a compensation
6  plan? They are not challenging the compensation plan, that
7  you didn't include overtime in the regular rate for
8  nonexempts. That has no bearing upon what particular job
9  duties any loan officer performed.
10     Their burden is to prove a common and unlawful
11 policy, and it is not unlawful to classify employees as
12 exempt from overtime. That point is made in *Trinh*. It's
13 made by the Ninth Circuit in *Wells Fargo*. It's made in a
14 class that plaintiffs cite in their reply brief, the *Colson*
15 *v. Avnet* case. It's made in the *Mike v. Safeco* case and many
16 others.
17     It's only unlawful to treat an employee as exempt
18 if they are not truly exempt, and that gets to the heart of
19 the individualized issues that need to be adjudicated in this
20 case.
21     There are six potentially applicable exemptions.
22 And this isn't just coming from us. If you read the
23 plaintiffs' brief, their opening brief, they brief four of
24 the six exemptions. Why are they doing that? Because they
25 know there are potentially multiple applicable exemptions to

18

1  loan officers.
2      And what's more, your Honor, there are different
3  exemption tests that apply to each individual loan officer.
4  So a loan officer that made more than $100,000 in one year
5  would have the highly compensated employee exemption test
6  apply to that person. And then in another year where they
7  didn't make 100,000, they would have a completely different
8  exemption test.
9      So there are multiple exemption tests that could be
10 applied to the same loan officer. And Judge Zagel in the
11 *Gromek* case observed the complications of applying multiple
12 exemption tests to different periods of time.
13     So what exemption and what exemption tests applies
14 to each loan officer is necessarily individualized. You have
15 the highly compensated employee exemption. You didn't hear
16 Mr. Maduff say a word about it.
17     One of his clients -- one of his six clients made
18 over 100,000. In fact, he made over $200,000. He would be
19 governed by the highly compensated exemption; whereas,
20 another one of his plaintiffs would not. So you would be
21 looking at a completely different exemption for even his own
22 clients.
23     The outside sales exemption might apply depending
24 upon the particular job duties of the loan officer. Kyle
25 Kasperick, a loan officer, testified that he spent 75 percent

19

1  of his time outside the office.
2      The executive exemption might apply. David Webster
3  testified that he supervised multiple other loan officers
4  while he himself worked as a loan officer. And Mr. Becton,
5  the named plaintiff in this case, spent virtually the entire
6  statute of limitations supervising six to ten other loan
7  officers.
8      Now, we pointed that out in our briefs. You didn't
9  hear Mr. Maduff deny that at all. So he would be governed by
10 the executive exemption.
11     THE COURT: Well, for all but I guess two months.
12     MR. SHAULSON: Correct. Exactly. Exactly.
13     And then the administrative exemption might apply
14 to Angi Queenan, for example, who testified that her main
15 duty was to advise clients about their financial
16 circumstances.
17     And then we get to an interesting exemption, the
18 combination exemption. And I will refer the Court to the
19 Seventh Circuit's decision in *Schmidt v. Eagle Waste*. That
20 was a case where a salesperson spent their time outside of
21 the office meeting with clients a few days a week and then
22 came back into the office and maintained the database that
23 they used to identify clients, did some client relations and
24 customer service work, did some marketing and promotion work.
25 And the Seventh Circuit said even if that employee

20

1  didn't satisfy the administrative exemption because their
2  primary duty wasn't administrative or didn't satisfy the
3  outside sales exemption because their primary duty was
4  outside sales, they can still tack those exemptions together
5  and meet the exemption and be exempt. So for a combination
6  exemption you would need to look at each loan officer
7  individually.
8      Now, what *Trinh* said was, "Whether JPMorgan Chase
9  loan officers are exempt necessarily involves a fact-by-fact
10 inquiry into the circumstances of each employee to see if he
11 or she falls within an administrative, outside sales, highly
12 compensated, combination, or any other exemption." I did not
13 hear plaintiffs' counsel make a cogent argument against the
14 *Trinh*'s rationale.
15     In *Wells Fargo* -- this is the only circuit court to
16 consider the exempt status of loan officers in two companion
17 cases. The Ninth Circuit in *Wells Fargo* and *Countrywide*
18 determined that the exempt status of loan officers "requires
19 a fact-intensive inquiry into each potential plaintiffs'
20 employment situation."
21     And, by the way, the Ninth Circuit was only ruling
22 with respect to one exemption, the outside sales exemption.
23 It wasn't even considering the other exemptions that could
24 complicate this case and require a further individualized
25 inquiry.

21

1  Now let me talk about plaintiffs' evidence because
2  it is their burden.
3  Here is what plaintiffs have: One, a job
4  description.
5  Now, granted, they copy the job description 165
6  times for the Court and give you the job description 165
7  times, so that doesn't do it.
8  The job description doesn't say where employees are
9  supposed to perform their job, that you have to spend 80
10 percent of your time in the branches. In fact, it says the
11 exact opposite. It says that loan officers can perform their
12 job either inside or outside JPMorgan Chase's offices.
13 It doesn't say anything about how much money loan
14 officers make. And it certainly doesn't say anything about
15 how much time each loan officer should perform each various
16 duty.
17 And Judge Conlon in the *Forney* case said, "Whether
18 similarly situated employees exist depends upon the
19 employees' actual qualifications and day-to-day job duties,
20 rather than their job descriptions."
21 Judge Zagel in the *Gromek* case said a common job
22 description is "insufficient to establish the exempt status
23 of an employee."
24 The second thing the plaintiffs have, that is
25 six -- he talks about 18 consents. A consent is just a form.

22

1  It says, hi, my name is so and so, and I would like to make
2  some money.
3  He has got six boilerplate declarations. And in
4  those declarations there are only two things, two things the
5  declarants say about the class.
6  They say, one, "From talking with people I know who
7  worked at JPMorgan, I know that the above-described pay
8  practices were consistent for all similarly situated persons;
9  e.g., loan officers" -- not In-Footprint loan officers --
10 "employed by JPMorgan during the time period that I worked at
11 JPMorgan." That's at Paragraph 31 of each and every
12 declaration.
13 That's rank hearsay and it's inadmissible. And
14 even Judge Gottschall said in *Howard* that plaintiffs'
15 declarations must, at a minimum, be based upon personal
16 knowledge.
17 Now, the second thing that the plaintiffs say in
18 their declarations about the class is, "I know that JPMorgan
19 has hundreds of branches across the nation that operate in
20 the same fashion."
21 Well, that's just wholly conclusory without any
22 foundation. That's nothing at all.
23 And the court -- the Northern District of Illinois
24 in *Aceveo v. Ace Coffee* said that the plaintiffs' showing
25 must be made based upon admissible evidence.

23

1  Now, let's take a look at what the declarations
2  don't say.
3  They don't say what these folks do. They don't say
4  how much time they spent doing each of these duties. They
5  don't say how much time they spend outside the office versus
6  inside the office.
7  The only reason why these declarations sound even
8  remotely the same is because all they did was regurgitate
9  plaintiffs' counsel's statements.
10 If you look at them, they are paragraph by
11 paragraph, word for word. Each paragraph is the same words
12 as is the same paragraph in someone else's declaration.
13 Paragraph 5 says, "My primary job duty was to sell
14 JPMorgan Chase loan products." My primary duty? That's the
15 legal standard. All they are doing is regurgitating the
16 legal test.
17 I will submit to the Court that that's not even
18 enough to meet a *Twombly* motion to dismiss. And the standard
19 we have to concede here, the standard for certification for
20 thousands of employees is more than *Twombly* on a motion to
21 dismiss standard.
22 Indeed, in the Northern District of Illinois
23 multiple judges have said that you don't have to accept the
24 allegations as true, which is different and stronger than the
25 *Twombly* standard.

24

1  Now, in *Flores v. Lifeway Foods* Judge Norgle
2  refused to grant conditional certification where there are
3  affidavits showing that there was an improper pay practice
4  with respect to 4 percent of the purported class, 4 percent.
5  If you take the six declarations that were
6  submitted here by over the 2600 loan officers, full-time loan
7  officers that are employed today as opposed to how many are
8  actually employed during the class period, that's 2/10 of 1
9  percent.
10 We are going to grant certification and force
11 JPMorgan Chase to the burden of spending a million dollars or
12 more in discovery and perhaps a lot more simply because they
13 have boilerplate declarations from 2/10 of 1 percent of the
14 population that are wholly conclusory?
15 Now let me address the *Rottman v. Old Second* case
16 that Mr. Maduff referred to.
17 That's a small bank located only in Illinois.
18 There was a policy there that was alleged that loan officers
19 were required to be available at all times to take customer
20 service calls. Basically being a call center environment.
21 That's a completely different case. And there were no
22 declarations from the defendants as far as I could see.
23 There was no argument about this individualized inquiry that
24 needed to be made based upon multiple exemptions.
25 Here there are six different exemptions. There is

25

18 declarations from the defendant. And plaintiffs' own class definition shows that there is an individualized inquiry, at least with respect to outside versus inside.

Let me just conclude with the collateral estoppel issue that your Honor asked about. Plaintiffs are barred by collateral estoppel. It is controlling Seventh Circuit law that a denial of class certification bars a subsequent class certification decision.

Even when you have different counsel, even when you have different plaintiffs, different named plaintiffs.

In fact, in *Anyere* this court, Northern District of Illinois, applied *Bridgestone* to prohibit a collective certification of an FLSA case even though there are different counsel, different plaintiffs, and a different and more narrow class.

The elements of collateral estoppel are met here.

First, the issue was the same: whether conditional certification of JPMorgan Chase loan officers was appropriate.

Second, the issue was actually litigated. Evidence was submitted. It was briefed, and a decision, a written decision, was issued.

As far as the other two elements of collateral estoppel, determination was essential to final judgment, and the class rep was adequate. In both the Seventh Circuit and

26

in *Anyere* the court said that those elements are satisfied where there is a denial of class certification and even if there are different named plaintiffs.

Now, plaintiffs argue that this job code, HRSTKA, that that's somehow different. Well, they failed to explain how *Trinh* is different than this case.

In-Footprint loan officers, they could be handling prime loans. They could be handling subprime loans. They could be managing. They fail to explain how the variations among what loan officers do in *Trinh* is any different from this case. And they can't solve it by saying, well, we are only going after In-Footprint who sold within the branch as opposed to outside the branch.

The court should deny certification and notice here. Conditional certification is precluded by the Seventh Circuit controlling law and the *Trinh* decision. And plaintiffs have failed to meet their burden of defining an ascertainable class and also of showing that they were victims of a common and unlawful policy.

Thank you very much, your Honor.

THE COURT: Just one question for you.

MR. SHAULSON: Sure.

THE COURT: The declarations that were submitted by the defendant in response to the motion for notice, those A through R, I think it was, are those individuals who provided

27

declarations all people who have this HSRTKA job classification?

MR. SHAULSON: Judge, I believe there may be a few who do not have that job code.

And you have to remember that when we were opposing, the notice that they proposed sending out was to all loan officers. The complaint was all current and former loan officers.

THE COURT: So it's been narrowed.

MR. SHAULSON: Well, there were only a few, I believe, like one or two, maybe three, of the 18 that didn't have that job code. So anyone who said that they were assigned to a branch, which is just about every one of them, they were all that job code as far as I understand.

THE COURT: All right. Thank you.

MR. SHAULSON: Thank you, your Honor.

THE COURT: Let me tell you where I am on this.

Mr. Maduff has emphasized the fact that there was a common pay plan, a job description that appears to be identical, this code, and the fact that 16-some-odd loan officers, In-Footprint loan officers, have filed consents. It seems to me that's a good start.

I don't know that it's enough. *Trinh* is important to me, although I will put it aside for one moment because I do think that it's at least imaginable to me that a much

28

narrower class definition might be viewed as somehow permitted even post *Trinh*.

I don't know that the class definition that has been made here, although certainly narrower than the one that the *Trinh* court looked at, resolves the problems that the *Trinh* court identified and that is at least suggested in the declarations that have been submitted by defendants in this case.

Those declarations show that some of the loan officers who would apparently be purported class members supervise other people. Some -- more than a few -- earn more than $100,000 a year.

Many of them, I explain that they exercise judgment. And by that I mean, for example, they declared under oath that they counsel clients about what loans would be appropriate for them, what kinds of loan packages would be appropriate for them and when, significantly, it would be a wise idea to lock in a particular interest rate.

It seems to me that that is an exercise of judgment.

The loan officers who gave declarations explained that they exercised discretion about where they work -- at least some of them did -- and when they work. Several made the comment that, although they attend meetings when they are in the facility, they are not required to.

29

Several explained that they work in what they believe to be a capacity as a financial adviser to clients, assessing the client's needs and what loan product would be the best fit.

They explain that the number of hours they work varies. One, for example, made the point that while the mortgage loan industry was slow, his hours dropped to something like 30 per week. Other times, as we know, loan officers work many, many more hours than that. And that's, in fact, what this case is all about.

We are also -- there was also declarations that indicate that Mr. Becton himself worked as a loan officer only for two months in 2009.

And Mr. Mistal identifies his own position with JPMorgan as that of a producing sales manager. Now, that might just be his attractive way of presenting himself on LinkedIn as opposed to an actual comment about what his job responsibilities are.

But I am concerned that the individualized questions about whether loan officers in certain circumstances, in certain markets, under certain management are in fact exempt. And for that reason, although I am not prepared to say that it is impossible that we could proceed with a collective action in this case, I am prepared to conclude that the proposal that's been made is simply too

30

broad and doesn't satisfy me that the plaintiff has met what is the plaintiffs' burden.

Although, again, it's not the same as a Rule 23 burden -- I have written about that myself -- there still has to be a showing that we really are dealing with common questions about -- not only about pay. I think Mr. Maduff has made that point by presenting the pay plan, the job description, the code, et cetera, but also about job performance circumstances and the individual roles that the loan officers played.

Respectfully, it is true that there are FLSA cases where nationwide classes are certified. I myself identify a nationwide class of RadioShack managers. I did that, however, only after a significant hearing, after hearing from several of them on the witness stand, after concluding that there was a sufficient basis to conclude that there really was very, very little exercise of discretion or at least evidence from which a jury could find that.

I haven't had a hearing of anything like that scope here.

What I have seen, to both sides' credit, is a significant evidentiary record that's been created, albeit one on paper. But what I am seeing from that evidentiary record is that we are not seeing people fall into a really common pattern of supervision and direction as I saw, for

31

example, in the *RadioShack* case.

Judge Bucklo in the *Rottman* case does identify, I think, what, in fairness, is a loan officer class, true, but it's a much, much more narrow one, one that relates to a single -- a small bank that operates within a single state. Although there are several locations, all of those bank officers had what -- I am sorry. Those loan officers had what I think to be a very standard supervision concern that they were raising.

I don't need to tell you whether I would necessarily come out the same way Judge Bucklo did in that case. I recognize that the *Trinh* case itself poses some obstacles to any broader class than has been proposed here, and one that's as broad as what's proposed here is one I am not comfortable with.

Mr. Maduff, I am happy to give you another chance to propose a much more narrow class definition that specifically excludes some of the concerns that I would have about the executive exemption, the administrative exemption, some of the exemptions that are kind of hinted at, if not broadly stated, by the defendant's submissions.

But I personally, having not looked at it a whole lot harder than what you have heard, would be surprised to hear that we are going to be able to identify a nationwide group of loan officers in this case.

32

I don't know exactly how tightly JPMorgan Chase supervises loan officers, but I have to believe that there is some local supervision that goes on in a way that suggests that they don't all do the same things in the same way for the same money under the same circumstances. And that's the reason that at this stage the motion for judicially supervised notice will be denied without prejudice.

If you should decide to go ahead and see if you can find another -- pursue this further, it may be that we will have to do some expedited discovery.

For example, perhaps deposing some of the individuals that offered declarations, perhaps by telephone to make this -- to streamline this. Obviously even expedited discovery is complicated and expensive. If it's more than everybody can handle, you obviously can consider the possibility of suspending the statute of limitations during -- for the period of time that the discovery takes place.

But I think I am going to suggest, Mr. Maduff, that you become creative about ways to define this class where it's really obvious who falls within and without side it and where we don't have individual questions about what exemptions may or may not be available to the various participants in the class.

So why don't I give you some time to think about

Becton v. JPMorgan Chase 11C331 (4/11/11)

33

1  that, and we will set a status. Maybe early May. May 3rd.
2  That would be at 9:00 o'clock.
3          MR. HURKA: Your Honor, my only question is I am on
4  trial that week with Judge Feinerman.
5          THE COURT: Is the following week better for you?
6          MR. HURKA: Great, your Honor. I appreciate that.
7          THE COURT: The 10th? We will see you on the 10th,
8  then, at 9:00 o'clock.
9          Thank you.
10         MR. MADUFF: Thank you.
11         MR. HURKA: Thank you, your Honor.
12         (An adjournment was taken at 2:49 p.m.)
13                  *   *   *   *   *
14 I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
15
16 /s/ Frances Ward                        April 22, 2011.
   Official Court Reporter
17 F
18
19
20
21
22
23
24
25